**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ORBIS GLOBAL EQUITY LE FUND (AUSTRALIA REGISTERED), ORBIS GLOBAL EQUITY FUND (AUSTRALIA REGISTERED), ORBIS GLOBAL BALANCED FUND (AUSTRALIA REGISTERED), ORBIS SICAV, ORBIS INSTITUTIONAL GLOBAL EQUITY L.P., ORBIS GLOBAL EQUITY FUND LIMITED, ORBIS INSTITUTIONAL FUNDS LIMITED, ALLAN GRAY AUSTRALIA BALANCED FUND, ORBIS OEIC, and ORBIS INSTITUTIONAL U.S. EQUITY L.P.,<br><br>Plaintiffs,<br><br>v.<br><br>ALTA MESA RESOURCES, INC., f/k/a SILVER RUN ACQUISITION CORPORATION II; RIVERSTONE HOLDINGS LLC; ARM ENERGY HOLDINGS LLC; BAYOU CITY ENERGY MANAGEMENT, LLC; HPS INVESTMENT PARTNERS, LLC; JAMES T. HACKETT, HARLAN H. CHAPPELLE, WILLIAM GUTERMUTH, JEFFREY H. TEPPER, DIANA J. WALTERS; MICHAEL E. ELLIS; RONALD SMITH; DON DIMITRIEVICH; PIERRE F. LAPEYRE, JR.; DAVID M. LEUSCHEN; WILLIAM W. MCMULLEN; DONALD SINCLAIR; STEPHEN COATS; and THOMAS J. WALKER,<br><br>Defendants. | Master File _____________________<br><br>**COMPLAINT AND JURY DEMAND**<br><br><u>JURY TRIAL DEMANDED</u><br><br>**ECF CASE** |

Plaintiffs Orbis Global Equity LE Fund (Australia Registered), Orbis Global Equity Fund (Australia Registered), Orbis Global Balanced Fund (Australia Registered), Orbis SICAV, Orbis Institutional Global Equity L.P., Orbis Global Equity Fund Limited, Orbis Institutional Funds Limited, Allan Gray Australia Balanced Fund, Orbis OEIC, and Orbis Institutional U.S. Equity L.P. (together, "Orbis" or "Plaintiffs"), through their undersigned attorneys, bring this direct action (the "Action") by way of this Complaint and Jury Demand, for their claims against Defendants Alta Mesa Resources, Inc. ("Alta Mesa" or the "Company"), James T. Hackett, Thomas J. Walker, William Gutermuth, Jeffrey H. Tepper, Diana J. Walters, Stephen Coats (together, the "Proxy Defendants"), Harlan H. Chappelle, Michael E. Ellis, Ronald Smith (together, the "Management Defendants"), David M. Leuschen, Pierre F. Lapeyre, Jr., William W. McMullen, Don Dimitrievich, Donald Sinclair (together, with Hackett, Gutermuth, Tepper, and Walters, the "Board Defendants"), Riverstone Holdings LLC ("Riverstone"), Bayou City Energy Management, LLC ("Bayou City"), HPS Investment Partners, LLC ("HPS"), and ARM Energy Holdings LLC ("ARM Energy," and together with Riverstone, Bayou City, and HPS, the "Control Entity Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: filings by Alta Mesa with the United States Securities and Exchange Commission ("SEC"); press releases, public documents and media reports concerning Alta Mesa; analyst reports concerning Alta Mesa; transcripts of conference calls and earnings calls involving Alta Mesa; pleadings, motion papers, transcripts and exhibits to declarations filed in the bankruptcy proceedings styled *In re Alta Mesa Resources, Inc. & Alta Mesa Holdings, LP*, Case No. 19-35133-H1-11 (S.D. Tex. Bankr.) (the

"Bankruptcy Proceeding"), including adversary proceedings filed therein; pleadings, motion papers and exhibits to declarations filed in the matter *In re Alta Mesa Resources, Inc. Securities Litigation*, Case No. 4:19-cv-00957 (S.D. Tex.) (the "Class Action"); the Court's April 14, 2021 Opinion in the Class Action (No. 19-cv-957, ECF No. 160); and other public information regarding the Company. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This securities fraud, common law, and Texas statutory action arises from the sustained and intentional abuse by Defendants of the corporate form known as a special purpose acquisition company ("SPAC")—in which a blank-check company conducts an initial public offering and then subsequently merges with an operating company that then becomes publicly traded—in order to mislead public investors, including Orbis, and perpetrate Defendants' fraud. Indeed, Defendants' misconduct included directly misleading Orbis' investment advisors during numerous in-person meetings and calls. Orbis relied to its detriment on what Defendants misrepresented to Orbis' investment advisors during these meetings in purchasing and holding Alta Mesa securities.

2. The SEC and market commentators have warned that SPACs have the potential to defraud public investors while at the same time enriching company insiders and promoters. Indeed, on March 30, 2022, the SEC issued a raft of proposed rules to further regulate SPACs in order to deter abuses and frauds that have occurred and protect public investors.

3. Defendants' conduct, as alleged herein, is a paradigmatic example of the abusive

SPAC conduct that the SEC is seeking to deter. Defendants deceived public investors, including Orbis, while benefiting Defendants. Specifically, private equity company Riverstone created SPAC, Silver Run Acquisition Corp. II ("Silver Run"), that went public in March 2017 and sought to merge with a private energy company.

4. On August 17, 2017, Silver Run announced that it would merge with Alta Mesa Holdings ("AMH"), an oil and gas producer that concentrated on drilling in the so-called STACK area of Oklahoma,[1] and Kingfisher Midstream LLC ("Kingfisher"), a midstream company operating in the STACK that was intertwined with AMH, its biggest customer.

5. From the announcement of the Silver Run-AMH-Kingfisher merger (the "Merger") and continuing after the Merger was consummated, forming Alta Mesa, Defendants engaged in a continuous, intentional campaign of materially false and misleading statements designed to deceive public investors, including Orbis. These included statements, which were materially false and misleading when made, about, among other things: (i) AMH's oil reserves; (ii) projected 2018 and 2019 earnings for AMH and Kingfisher; (iii) Alta Mesa's ability to sustain growth; (iv) Alta Mesa's undisclosed strategic decisions to prioritize temporary oil production gains at the expense of long-term production viability; and (v) Alta Mesa's internal controls over financial reporting.

6. Unbeknownst to the investing public, including Orbis, at the time Defendants made these statements, they knew but intentionally did not disclose that: (i) the production results from AMH's drilling through 2017 did not support the projections made to investors, including Orbis; (ii) as a result, and also because Kingfisher had essentially been looting AMH through unfair related-party contracts, Kingfisher's projections made to investors, including Orbis, were similarly

[1] The STACK is the acronym for an oil exploration area in a specific geographic region in the Anadarko Basin area of Oklahoma. It stands for Sooner Trend (oil field), Anadarko (basin), Canadian and Kingfisher (counties).

unachievable; (iii) AMH and Alta Mesa's drilling approach and techniques, including drilling too many wells per pad, too close together, and using S-shaped wellbores, rendered the production projections false when made; and (iv) Alta Mesa had material weaknesses in its internal controls over financial reporting.

7. Indeed, this Court has already held that plaintiffs in the Class Action "have detailed numerous statements by various defendants from SEC filings, press releases, conferences, and earnings calls," and that the "circumstances surrounding the company's financial reporting . . . are alone enough to entitle Plaintiffs to discovery." (No. 19-cv-957, ECF No. 160, at 25.)

8. It did not take long for Defendants' lies to catch up with Alta Mesa.

9. In February 2019—just one year after Silver Run merged with AMH and Kingfisher—Alta Mesa was required to take a $3.1 billion write-down. Alta Mesa ultimately filed for Chapter 11 bankruptcy protection on September 11, 2019. Thus, within two years of the merger, Alta Mesa had gone belly up, and its common stock had fallen over 99%. Those stock price decreases inflicted tens of millions of dollars of damages on Orbis.

10. Defendants' conduct was intentional. Defendants were highly motivated to make any statements—even materially false and misleading statements—that would encourage Silver Run shareholders, including Orbis, to vote for the acquisition of AMH and Kingfisher. As a blank-check SPAC, if Silver Run did not merge with an operating company within two years of its March 2017 initial public offering, it would be forced to repurchase all of Silver Run shares from public investors and Riverstone would lose its entire investment. Had Orbis known the truth, it would not have held its Silver Run shares through the acquisition of AMH and Kingfisher, and would have instead sold those shares on the open market or redeemed them at their $10 offering price. Instead, relying on Defendants' materially false and misleading statements, Orbis held its shares

and was damaged when Alta Mesa eventually failed.

11. Likewise, Bayou City, HPS, and ARM had enormous incentives to lie to investors about the prospects of AMH and Kingfisher because those entities stood to profit to the tune of more than $1 billion if the merger were successful. Those entities also were in line to profit from a planned spinoff of Kingfisher as a separate, publicly traded midstream company.

12. Thus, from top to bottom, Defendants were specially financially motivated to commit the fraud and misconduct alleged herein. Indeed, in denying the motion to dismiss the Class Action Complaint, the Court held that severe recklessness, sufficient to plead scienter under Section 10(b), was shown based on allegations that (i) the $3.1 billion February 2019 write-down "constituted over 80% of Alta Mesa's value and was disclosed a year after the special purpose acquisition company merger"; (ii) "[t]he write-down came simultaneously with the news that Alta Mesa's accounting firm identified sixteen 'material weaknesses' in Alta Mesa's internal control over financial reporting," including (a) "ineffective controls over the identification and processing of relevant and reliable information," (b) "ineffective controls over the financial statement close and disclosure process, including the completeness, existence and accuracy of the financial information," and (c) "ineffective management review controls over various complex accounting estimates"; (iii) "[t]he SEC is investigating the write-down and Alta Mesa's accounting practices"; and (iv) the Class Action Complaint included "accounts of two production engineers" that "AMH and Alta Mesa clandestinely used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates both before and after the merger." (No. 19-cv-957, ECF No. 160, at 27-28.)

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b), 14(a), 18 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78n, 78r, and 78t(a), and SEC Rule 10b-5 (17 C.F.R. §§ 240.10b-5), as well as under common and Texas statutory law.

14. This Court has jurisdiction over this Action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa), and has supplemental jurisdiction over the common law and Texas statutory claims pursuant to 28 U.S.C. § 1367(a).

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aaI), as well as 28 U.S.C. § 1391(b), because Alta Mesa maintains offices in this District and many of the acts giving rise to the violations complained of in this Action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District. In addition, Alta Mesa's bankruptcy case is pending in this District.

16. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Plaintiffs

17. Plaintiff Orbis Global Equity LE Fund (Australia Registered) is a unit trust organized under the laws of Australia. It purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after October 20, 2017, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued

correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

18. Plaintiff Orbis Global Equity Fund (Australia Registered) is a unit trust organized under the laws of Australia. It purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after October 20, 2017, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

19. Plaintiff Orbis Global Balanced Fund (Australia Registered) is a unit trust organized under the laws of Australia. It purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after October 20, 2017, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

20. Plaintiff Orbis SICAV is an investment company (Société d'Investissement à Capital Variable) organized under the laws of Luxembourg. Through its subfunds Orbis SICAV Global Equity Fund and the Orbis SICAV Global Balanced Fund, it purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after January 17, 2018, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

21. Plaintiff Orbis Institutional Global Equity L.P. is a limited partnership organized

under the laws of the State of Delaware. It purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after October 20, 2017, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

22. Plaintiff Orbis Global Equity Fund Limited is a mutual fund company organized under the laws of Bermuda. It purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after October 20, 2017, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

23. Plaintiff Orbis Institutional Funds Limited is a mutual fund company organized under the laws of Bermuda. Through its subfund Orbis Institutional Global Equity Fund, it purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after October 20, 2017, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

24. Plaintiff Allan Gray Australia Balanced Fund is a unit trust organized under the laws of Australia. It purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after January 25, 2018, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material

misstatements and omissions partially materialized.

25. Plaintiff Orbis OEIC is an investment fund organized under the laws of England and Wales. Through its subfunds Orbis OEIC Global Balanced Fund and Orbis OEIC Global Equity Fund, it purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after January 17, 2018, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

26. Plaintiff Orbis Institutional U.S. Equity L.P. is a limited partnership organized under the laws of the State of Delaware. It purchased or acquired Silver Run or Alta Mesa common stock at artificially inflated prices on or after October 20, 2017, and held those securities through and after March 29, 2018, when the first of a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements and as the foreseeable risks concealed by Defendants' material misstatements and omissions partially materialized.

27. At all relevant times, Orbis Investment Management Ltd. acted as investment manager to Plaintiffs in connection with their purchases or acquisitions of Silver Run and/or Alta Mesa securities, except for Plaintiff Orbis Institutional U.S. Equity L.P., whose investment manager was Orbis Investment Management (U.S.), L.P. (together, with Orbis Investment Management Ltd., "Orbis Investments").

28. At all relevant times, Alta Mesa, and the public, knew that Plaintiffs were significant shareholders of Silver Run and/or Alta Mesa. On information and belief, had Plaintiffs disposed entirely of their holdings of Silver Run and/or Alta Mesa, this fact, when publicly disclosed, would have caused the price of Silver Run and/or Alta Mesa stock to decrease.

### B. Defendants

#### 1. Defendant Alta Mesa

29. Alta Mesa was an oil and gas company with its principal place of business at 15021 Katy Freeway, Suite 400, Houston, Texas 77094. The Company was incorporated in Delaware and was focused on oil and gas exploration and production in the Anadarko Basin of Oklahoma. Prior to its bankruptcy filing on September 11, 2019, its Class A common shares traded on the NASDAQ under the symbol "AMR" and its public warrants traded under the symbol "AMRWW." Prior to the closing of the Merger in February 2018, Alta Mesa was a "blank check" company named Silver Run Acquisition Corporation II and its Class A stock traded on the NASDAQ under the symbol "SRUN," its public warrants traded under the symbol "SRUNW," and its ownership units, which contained both stock and fractional warrants, traded under the symbol "SRUNU."

#### 2. Proxy Defendants

30. Defendant James T. Hackett was the CEO and a director of Alta Mesa prior to the Merger and became Executive Chairman of the Alta Mesa Board of Directors (the "Board") following the Merger. Defendant Hackett was also the Chief Operating Officer ("COO") of Kingfisher and became Interim CEO of Alta Mesa following Defendant Chappelle's December 26, 2018 resignation. At the time of the Merger, Defendant Hackett was a Partner at Riverstone and co-head of Riverstone's Houston office. Prior to joining Riverstone in 2013, Hackett served as Chairman and CEO of Anadarko Petroleum Corporation. Defendant Hackett signed Alta Mesa's Proxy and the March 29, 2018 Form 10-K and spoke on Alta Mesa's behalf during numerous investor earnings calls.

31. Defendant Thomas J. Walker served as the CFO of Alta Mesa prior to the Merger. At the time, Walker was also a Partner of Defendant Riverstone. Defendant Walker signed Alta Mesa's August 16, 2017 Form 8-K.

32. Defendant William Gutermuth served as a member of Alta Mesa's Board of Directors at the time of the Merger. Defendant Gutermuth signed Alta Mesa's March 29, 2018 Form 10-K.

33. Defendant Jeffrey H. Tepper served as a member of Alta Mesa's Board of Directors at the time of the Merger. Defendant Tepper signed Alta Mesa's March 29, 2018 Form 10-K.

34. Defendant Diana J. Walters served as a member of Alta Mesa's Board of Directors at the time of the Merger. Defendant Walters signed Alta Mesa's March 29, 2018 Form 10-K.

35. Defendant Stephen Coats was Silver Run's corporate secretary prior to the Merger. Defendant Coats is a Partner, General Counsel and Chief Administrative Officer at Defendant Riverstone.

36. The above-named individual defendants are collectively referred to herein as the "Proxy Defendants." The Proxy Defendants were Alta Mesa's six Officers and Directors at the time the Proxy was drafted and issued. The Proxy was issued "By Order of the Board of Directors" and the Board recommended "that Silver Run stockholders vote FOR each of the Proposals."

### 3. <u>The Management Defendants</u>

37. Defendant Harlan H. Chappelle was the Chief Executive Officer ("CEO") of the combined publicly traded Alta Mesa entity following the Merger, as well as a member of Alta Mesa's Board of Directors. Defendant Chappelle had previously served as AMH's CEO since 2004. Defendant Chappelle resigned from Alta Mesa effective December 26, 2018. Defendant Chappelle signed Alta Mesa's March 29, 2018 Form 10-K, May 21, 2018 From 10-Q, August 15, 2018 Form 10-Q and November 14, 2018 Form 10-Q, as well as spoke on numerous earnings calls.

38. Defendant Michael E. Ellis was a Silver Run Vice President and Chief Operating Officer – Upstream following the Merger, and a member of Alta Mesa's Board of Directors.

Defendant Ellis signed Alta Mesa's March 29, 2018 Form 10-K. Defendant Ellis resigned from Alta Mesa effective December 26, 2018.

39. Defendant Ronald Smith was the Chief Accounting Officer for Alta Mesa. Defendant Smith signed Alta Mesa's March 29, 2018 10-K. Defendant Smith resigned from his role at Alta Mesa in July 2019 in the midst of the SEC's investigation into the Company's accounting practices.

40. Defendants Chappelle, Ellis and Smith are referred to collectively herein as the "Management Defendants."

**4. The Board Defendants**

41. Defendant David M. Leuschen served as a member of Alta Mesa's Board of Directors. Defendant Leuschen is a Founder of Defendant Riverstone and has been a Senior Managing Director at Riverstone since 2000. Defendant Leuschen signed Alta Mesa's March 29, 2018 Form 10-K.

42. Defendant Pierre F. Lapeyre Jr. served as a member of Alta Mesa's Board of Directors during the Class Period. Defendant Lapeyre is a Founder of Defendant Riverstone and has been a Senior Managing Director at Riverstone since 2000. Defendant Lapeyre signed Alta Mesa's March 29, 2018 Form 10-K.

43. Defendant William W. McMullen served as a member of Alta Mesa's Board of Directors following the Merger. Defendant McMullen is the Founder and Managing Partner of Defendant Bayou City Energy Management, LLC. Defendant McMullen signed Alta Mesa's March 29, 2018 Form 10-K.

44. Defendant Don Dimitrievich served as a member of Alta Mesa's Board of Directors following the Merger. Defendant Dimitrievich is a Managing Director at Defendant HPS

Investment Partners, LLC. Defendant Dimitrievich signed Alta Mesa's March 29, 2018 Form 10-K.

45. Defendant Donald Sinclair served as a member of Alta Mesa's Board of Directors following the Merger. Defendant Sinclair signed Alta Mesa's March 29, 2018 Form 10-K.

46. The above-named Defendants – Leuschen, Lapeyre, McMullen, Dimitrievich and Sinclair – along with Defendants Hackett, Gutermuth, Tepper and Walters, are referred to collectively as the "Board Defendants."

### 5. <u>The Control Entity Defendants</u>

47. Defendant Riverstone is a private equity firm focused on the energy sector and is comprised of, as relevant hereto, Riverstone Holdings, LLC, Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP. Defendant Riverstone and its affiliates created Alta Mesa, and sponsored the IPO and the Merger through various related affiliates and investment vehicles. Prior to the Merger, all of Alta Mesa's management was employed by Riverstone. Following the Merger, Riverstone appointed three directors to Alta Mesa's Board of Directors – Defendants Hackett, Leuschen and Lapeyre.

48. Defendant Bayou City Energy Management, LLC ("Bayou City") is an energy-focused private equity firm based in Houston, Texas. Bayou City has been involved with AMH since at least January 2016, when it entered into a joint development agreement with AMH to fund a portion of AMH's drilling operations. Bayou City also owns approximately 40% of relevant non-party High Mesa (the owner of AMH prior to the Merger and a partial owner of Alta Mesa following the Merger). Bayou City has two members on High Mesa's board of directors and also appointed its founder and managing partner William McMullen to the Alta Mesa Board of Directors.

49. Defendant HPS Investment Partners, LLC ("HPS") is a global investment firm. HPS was formerly affiliated with J.P. Morgan Asset Management and was known as Highbridge Principal Strategies. HPS owns a significant portion of Alta Mesa and appointed one of its managing directors, Defendant Dimitrievich, to the Alta Mesa Board of Directors.

50. Defendant ARM Energy Holdings LLC ("ARM Energy") is a producer services firm active in all major North American oil and gas basins. Prior to the Merger, ARM was the founder and majority owner of Kingfisher. ARM continued to be a shareholder of Alta Mesa following the closing of the Merger.

51. Defendants Riverstone, Bayou City, HPS and ARM Energy are collectively referred to herein as the "Control Entity Defendants." Defendants Bayou City, HPS and ARM Energy provided the operational information contained in the Proxy and were unjustly enriched when they received over $1.3 billion from the Merger.

### C. Relevant Non-Parties

52. High Mesa Holdings GP, LLC and High Mesa Holdings, LP (together, "High Mesa" or "HMI") were the owners and general partner of AMH prior to the Merger, and continued to own and control a portion of Defendant Alta Mesa and SRII Opco following the Merger. High Mesa also was a partial owner of Kingfisher prior to the Merger. Defendant Bayou City owns approximately 40% of High Mesa and appointed two members to High Mesa's board of directors (Mark Stoner and Defendant McMullen). Defendant Chappelle is also affiliated with High Mesa. High Mesa filed for Chapter 7 bankruptcy protection on January 24, 2020.

## IV. FACTUAL ALLEGATIONS

### A. The Formation of the Silver Run SPAC Vehicle

53. Alta Mesa began as a special purpose acquisition company called Silver Run Acquisition Corporation II. A special purpose acquisition company or SPAC is a shell (or blank-

check) company that exists solely to raise funds through an IPO that are then used to acquire an operating company.

54. The target company cannot be identified before the SPAC completes its IPO. At least 90% of the capital raised in the IPO must be deposited into a trust account, with the interest paid to the investors. The SPAC's management team must identify and acquire a target company within a specified time period, typically between 18 and 24 months. Under NASDAQ rules, the target company must have a fair market value equal to 80% of the balance in the SPAC's trust account. If the special purpose acquisition company's management team fails to acquire a target company within the specified time period, then the SPAC is dissolved and the IPO proceeds are returned to the investors. No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination. As explained by one commentator, SPACs "are a form of reverse merger"—a term used when "a successful private company merges with a listed empty shell to go public without the paperwork and rigors of a traditional IPO." Ivana Naumovska, *The SPAC Bubble is About to Burst*, HARVARD BUSINESS REVIEW, Feb. 18, 2021, https://hbr.org/2021/02/the-spac-bubble-is-about-to-burst.

55. Beginning in 2021, the SEC's Investor Advisory Committee ("IAC") began examining SPACs with an eye toward proposing that the SEC regulate SPACs more intensively with enhanced focus and stricter enforcement of existing disclosure rules under the Exchange Act. While legitimate vehicles when used by responsible sponsors and managers, unscrupulous sponors and management could abuse the SPAC vehicle for their own benefit. In laying out its case for greater transparency, the IAC prepared the following background statement on SPACs:

> In simple terms, a SPAC is a type of "blank-check" company that raises capital through an initial public offerings ("IPO") with the intention to use the proceeds to acquire other companies at a later time. Unlike traditional IPOs, SPACs do

> not have commercial operations at the time of the IPO, which explains why they are referred to as "blankcheck" or "shell" companies. SPACs first appeared in the 1980s but have gained accelerating popularity in recent years, especially since 2020. . . . After the SPAC completes a merger with the target company, the previously privately held target company becomes a publicly listed operating company. This last step of creating the listed successor company is referred to as a "de-SPAC" transaction.
>
> *SPACs can be an attractive option for sponsors because they can raise money rapidly without having to deal with company preparation or company specific disclosure at the time of the IPO. . . . Furthermore, the transactions by their very nature are complex and have some misalignments between the initial investors, sponsors, investors in the target and any intermediate financiers joining the de-SPAC transaction.*

56. The SEC's (well-founded) concern about misalignment between unscrupulous sponsors and investors arises from the fact that the sponsors have a greater incentive to identify a target and consummate a deal – regardless of the long-term prospects of that deal – thereby enabling the sponsor to monetize its so-called founder shares and avoid having to return the original investment principal to the SPAC's shareholders, even if that meant consummating a transaction that is bad for and not well-disclosed to ordinary investors. While many SPAC sponsors have no doubt analyzed deals with an eye toward what is good for both themselves and investors, many others have not. Thus, as the SEC has cautioned, in describing the two-step nature of SPAC transactions:

> A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates.

57. Thus, before the SPAC files for its IPO, the sponsor will pay a nominal amount,

often $25,000, for a number of founder shares which gives them up to 20% of the total shares outstanding after completion of the IPO. Those shares are then typically redeemable upon consummation of the de-SPAC transaction.

58. On March 30, 2022, the SEC proposed additional rules intended to further enhance investor protections in SPAC IPOs, as well as in subsequent business combinations between SPACs and private operating companies, targeted at unscrupulous sponsors and management.

59. Silver Run/Alta Mesa is a case study of how these unscrupulous Defendants conspired to utilize the potentially abusive structure of SPACs to engineer a great deal for themselves at the expense of ordinary investors such as Orbis.

**B. The Merger of Silver Run with AMH and Kingfisher**

60. The general terms summarized above applied to Silver Run's IPO, which was completed in March of 2017 and sponsored by Defendant Riverstone, a private equity firm focused on the energy sector.

61. Silver Run sold 103.5 million shares of common units to investors at $10 a share for gross proceeds of $1.035 billion. Under the terms of the IPO prospectus, Silver Run had two years to identify and acquire a target business or target businesses having an aggregate fair market value of at least 80% of the IPO proceeds held in trust. The IPO offering materials stated that Silver Run planned to pursue an acquisition that would capitalize on Riverstone's expertise in the energy industry by leveraging its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered attractive investment returns.

62. Silver Run's management team targeted two oil-and-gas companies, an upstream company, AMH, and a midstream company, Kingfisher. AMH focused on the development and

acquisition of unconventional oil and natural gas reserves in Oklahoma's STACK region, in the eastern portion of Oklahoma's Anadarko basin. Kingfisher focused on providing crude oil gathering, gas gathering, and processing and marketing to producers of natural gas, natural gas liquids, crude oil and condensate in the STACK.

63. The two companies, though nominally separate, were deeply intertwined. Not only did Kingfisher have overlapping ownership with AMH, but AMH and Kingfisher were operationally interconnected. In 2016, the year before Silver Run's IPO, nearly 97% of Kingfisher's revenues were derived from wells operated by AMH.

64. Silver Run's management viewed the synergistic relationship between AMH and Kingfisher as an asset; they emphasized in a press release on SEC Form 8-K that they had chosen to target AMH and Kingfisher in part because the two companies provided a perfect strategic match for Silver Run's desired integrated platform and an opportunity to create a pure-play STACK upstream and midstream company that would be the first of its kind in the public markets. *See* Silver Run Form 8-K dated August 16, 2017. Silver Run's management further stated that AMH's "core acreage position . . . ha[d] among the lowest breakevens in the U.S. at around $25 per barrel" and that Kingfisher had acreage dedication contracts with "five . . . third party customers" apart from AMH. *See* Silver Run Form 8-K dated August 16, 2017. In this context, the term "breakeven" refers to the "breakeven price—the price of oil needed to profitably drill a new well[.]" Michael D. Plante and Kunal Patel, *Breakeven Oil Prices Underscore Shale's Impact on the Market*, FEDERAL RESERVE BANK OF DALLAS: DALLAS FED ECONOMICS, May 21, 2019, https://www.dallasfed.org/research/economics/2019/0521. Silver Run's management saw big things for Kingfisher: on account of Kingfisher's "significant additional third party growth potential[,]" Silver Run's management intended to "spin off" Kingfisher in a potential future

midstream IPO. *See* Silver Run Form 8-K dated August 16, 2017.

65. On August 16, 2017, Silver Run announced that it had entered into a preliminary merger agreement with AMH and Kingfisher. The proposed transaction, valued at $3.8 billion, was subject to approval by Silver Run's shareholders. Critically, Silver Run shareholders who did not want to retain a continuing interest in the business after the merger had the right to redeem their shares at the time of the merger.

66. Silver Run issued a Definitive Merger Proxy Statement to its shareholders on January 19, 2018 ("the Proxy"). In the Proxy, Silver Run's board of directors recommended that its shareholders approve the merger with AMH and Kingfisher. The Proxy stated that AMH and Kingfisher were poised for accelerating growth immediately following the merger. Like the August 16, 2017 8-K filing, the Proxy emphasized the "low break-even commodity prices" of AMH's acreage and further indicated that Kingfisher had "long-term acreage dedication contracts from multiple active producers" and "firm takeaway contracts on key pipelines" and "was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects." The Proxy indicated that AMH had achieved an estimated 2017 average net daily production of 20.8 thousand barrels of oil equivalent per day ("MBOE/d"), and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d. The Proxy also stated that AMH had achieved 2017 adjusted EBITDAX . . . of $155 million, and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.[2] As for Kingfisher, the Proxy stated that Kingfisher was estimated to have achieved $42 million in

[2] EBITDAX is an acronym that stands for "earnings before interest, taxes, depreciation, depletion, amortization, and exploration expenses." EBITDA is an acronym that stands for"earnings before interest, taxes, depreciation, and amortization."

2017 EBITDA, and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.

67. The Proxy represented to investors that the estimates and projections contained therein were based on observable trends and capabilities, as well as economically justified assumptions regarding the expected cash flows of AMH and Kingfisher. The Proxy also included extensive statements regarding the quality of AMH's internal controls over oil and gas reserve estimates," including that:

> AMH's policies and practices regarding internal controls over the recording of reserves are structured to objectively and accurately estimate its oil and gas reserves quantities and present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices used by independent engineering firms and its peers and in accordance with the 2007 Petroleum Resources Management System sponsored and approved by the Society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers

68. According to the Proxy, AMH's internal control methodologies included reviews of production trends, material balance calculations, analogy to comparable properties and/or volumetric analysis.

69. Silver Run's shareholders voted to approve the merger on February 6, 2018. The merger with AMH and Kingfisher closed on February 9, 2018. At that point, the new combined, publicly traded company became known as Alta Mesa, and AMH and Kingfisher became subsidiaries of Alta Mesa. *See* Alta Mesa Form 10-K dated March 29, 2018.

**C. Alta Mesa's Post-Merger Financial Disclosures Immediately Fall Short**

70. Less than two months after the merger closed, on March 29, 2018, Alta Mesa filed its first 10-K with the SEC, issued an earnings release, and held an earnings call. The earnings release dramatically reduced the EBITDA and production estimates provided in the Proxy.

Nevertheless, Alta Mesa's executives denied that the announcement indicated that AMH and Kingfisher had been overvalued in the Proxy.

71. According to the March 29, 2018 release, "Kingfisher was expected to post only $95 to $110 million in EBITDA at the midpoint of 2018, 46% below the 2018 EBITDA estimate of $185 million provided in the January 19, 2018 Proxy." In its SEC filings, Alta Mesa explained the swift revision to Kingfisher's earnings estimate by saying that, "[i]n late 2017 and early 2018, drilling and completions by third party E&P operators under contract with Kingfisher slowed considerably." *See* Alta Mesa Form 8-K dated March 29, 2018.

72. Alta Mesa's CEO, Defendant Chappelle, echoed this explanation in the earnings call, telling investors and analysts that "multiple 'large third-party producers' had delayed drilling on acreage served by Kingfisher, which pushed Alta Mesa's timeline for growing its pipeline business back by six months and a possible public offering of Kingfisher 'perhaps' into 2019." Incredibly, Chappelle admitted that these "setbacks" began in late 2017—*i.e.*, *prior to* the Silver Run shareholder vote on the merger with AMH and Kingfisher, and before the merger occurred.

73. The release also revised AMH's production estimates downward, stating that "AMH was expected to post an average net daily production of only 33 to 38 MBOE/d at the midpoint for the year, 8% below the production figures provided in the Proxy."

74. Despite these negative statements, Chappelle reassured investors and analysts on the earnings call that "the problems were temporary" and that the revised estimates only represented a "two-month shift in the calendar" for AMH and a "six-month shift in the calendar" for Kingfisher.

75. Alta Mesa's share price dropped after the March 29, 2018 announcements. After closing at $8.38 per share on March 28, 2018, Alta Mesa's stock closed at $8.00 per share on

March 29, 2018 and then $7.06 per share on April 3, 2018.

### D. Alta Mesa's Second Quarter 2018 Results Also Fall Short

76. Alta Mesa's second quarter 2018 results also failed to meet expectations, but its executives continued to represent that the problems were temporary and that a turnaround was imminent.

77. In its second-quarter 2018 financial disclosures, Alta Mesa further decreased AMH's average net daily production estimate to only 30.0 MBOE/d at the midpoint for 2018, which was 22% below the estimates provided in the Proxy. *See* Alta Mesa Form 8-K dated August 14, 2018. Alta Mesa blamed the lowered production estimate to "offset well shut-ins for fracture stimulation effectiveness." *See* Alta Mesa Form 8-K dated August 14, 2018.

78. On an earnings call, Defendant Chappelle explained that the well shut-ins resulted from work done or planned in the fourth quarter of 2017 that had lingered into the first quarter of 2018. Alta Mesa's second-quarter 2018 financial disclosures also revealed that Kingfisher, which the Proxy had estimated would have 2018 EBITDA of $185 million, had only $6.1 million in EBITDA for the quarter. *See* Alta Mesa Form 8-K dated August 14, 2018. Defendant Chappelle blamed the dip in production on short term logistics and not any fundamental changes.

79. Alta Mesa's share price plummeted over 21% on the second-quarter 2018 news, from $6.08 a share at close on August 13, 2018 to $4.77 a share at close on August 14, 2018.

### E. Alta Mesa's Third Quarter 2018 Results Are No Better Than Previous Results and Its CFO Resigns

80. In its third quarter of 2018 results announcement, Alta Mesa again decreased its 2018 EBITDA estimate for Kingfisher to $36 to $38 million. *See* Alta Mesa Form 8-K dated November 13, 2018. Incredibly, Kingfisher's projected 2018 EBITDA was now essentially ***80%***

***less*** than the Proxy projections from less than 10 months earlier.

81. On an earnings call about the third-quarter 2018 results, the Executive Chairman of Alta Mesa's Board of Directors, Defendant Hackett, blamed Alta Mesa's lackluster performance on "significant headwinds" and "technical challenges."

82. On November 13, 2018, Alta Mesa's CFO, Michael McCabe, announced he was leaving the company.

83. Alta Mesa's share price declined by nearly 15% between close on November 13, 2018 and close on November 14, 2018. The share price then dropped another 5% the next day. Alta Mesa's stock closed at $2.29 a share on November 15, 2018.

**F. More Executives Resign, Alta Mesa Discloses Material Internal Control Weaknesses, Is Unable to File Its 2018 Annual Report, Takes a *$3.1 Billion* Write-Down, and Ultimately Goes Bankrupt**

84. One month later, on December 26, 2018, two more Alta Mesa executives—Chappelle and Defendant Ellis, Vice President and COO–Upstream—resigned.

85. On February 25, 2019, Alta Mesa disclosed in an SEC filing that it would not be able to file its 2018 annual report on time and would be seeking an extension from the SEC. *See* Alta Mesa Form 8-K dated February 25, 2019.

86. Alta Mesa also disclosed that it had "determined that it had an ineffective internal control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures." *See* Alta Mesa Form 8-K dated February 25, 2019.

87. Making matters worse, Alta Mesa explained that it take material write-downs in the fourth quarter of 2018 to both AMH and Kingfisher. *See* Alta Mesa Form 8-K dated February 25, 2019. The impairment charges would be approximately $2.0 billion for AMH and approximately $1.1 billion for Kingfisher. *See* Alta Mesa Form 8-K dated February 25, 2019.

88. In all, the write-downs totaled ***$3.1 billion***. This was less than a year after the merger that valued Alta Mesa at $3.8 billion, ***thereby conceding that the AMH and Kingfisher assets acquired in the merger were basically worthless.***

89. Adding insult to injury, Alta Mesa also disclosed that it was laying off about a third of its employees.

90. Alta Mesa's share price cratered over 63% after the disclosures. After closing at $0.91 a share on February 25, 2019, Alta Mesa's stock closed at $0.34 a share on February 26, 2019. A week later, on March 4, 2019, Alta Mesa publicly confirmed in a formal Notification of Late Filing that it was not going to timely file its annual report because it expected to report material weakness in its internal control over financial reporting in the 2018 Form 10-K and needed additional time to ensure accuracy of its 2018 financial information. *See* Alta Mesa Form NT 10-K dated March 4, 2019. Alta Mesa also confirmed that it expected to report a 2018 net loss of $3.1 billion because of the write-down that it had disclosed a week earlier. *See* Alta Mesa Form NT 10-K dated March 4, 2019.

91. By this point, Alta Mesa's stock had decline almost 97% from its IPO price of $10, a mere year after the merger that the sponsors and others touted.

92. On March 22, 2019, another Alta Mesa executive, Crag Collins, resigned.

93. The delay in filing its annual report jeopardized Alta Mesa's NASDAQ listing. In April 2019, Alta Mesa received two notices from NASDAQ that the company was not in compliance with NASDAQ listing rules because it did not timely file its 2018 annual report and because its stock closed below $1.00 a share for thirty consecutive business days. *See* Alta Mesa Form 8-K dated April 8, 2019.

94. Despite NASDAQ's warning, Alta Mesa continued to fall further behind in its

financial reporting obligations. On May 13, 2019, Alta Mesa filed another formal Notification of Late Filing, this time relating to its quarterly report for the quarter ending on March 31, 2019. *See* Alta Mesa Form NT 10-Q dated May 13, 2019.

95. Alta Mesa also warned in its formal Notification of Late Filing that there was substantial doubt about its ability to continue as a going concern. *See* Alta Mesa Form NT 10-Q dated May 13, 2019. Alta Mesa's failure to file its quarterly report on time drew yet another delisting warning from NASDAQ.

96. On May 17, 2019, Alta Mesa disclosed that although it supposedly had made progress in finalizing its two delinquent reports, it still was unable to provide an estimated date for when those reports would actually be filed. *See* Alta Mesa Form 8-K dated May 17, 2019.

97. AMH, the upstream subsidiary, did file its 2018 annual report on May 17, 2019. In that report, AMH revealed that the SEC was investigating Alta Mesa about, among other things, the material weakness in its internal controls over financial reporting and the $3.1 billion write-down. *See* AMH Form 10-K dated May 17, 2019. AMH accounted for $2 billion of that write-down. *See* AMH Form 10-K dated May 17, 2019. AMH's 2018 annual report also disclosed that AMH was considering filing for Chapter 11 bankruptcy protection. *See* AMH Form 10-K dated May 17, 2019.

98. AMH's troubles led Alta Mesa to disclose a downward revision in a previously released estimate of its proved reserves and caused a further 25% drop in Alta Mesa's stock price, from $0.176 a share on Friday, May 17, 2019 to $0.131 a share on Monday, May 20, 2019. *See* Alta Mesa Form 8-K dated May 17, 2019.

99. On July 2, 2019, another Alta Mesa executive, Defendant Ronald Smith, Vice President and Chief Accounting Officer, resigned.

100. On August 9, 2019, Alta Mesa filed yet another formal Notification of Late Filing, this time about its quarterly report for the quarter ending on June 30, 2019. S*ee* Alta Mesa Form NT 10-Q dated August 9, 2019. Alta Mesa explained that it could not file the quarterly report because it was finalizing its year-end financial statements and also expected to report a material weakness in its internal controls over financial reporting. *See* Alta Mesa Form NT 10-Q dated August 9, 2019. That expectation was confirmed in Alta Mesa's 2018 annual report, which was filed two weeks later, on August 26, 2019.

101. Alta Mesa's 2018 annual report contained a report from the Company's independent accounting firm concluding that Alta Mesa "ha[d] not maintained effective internal control over financial reporting as of December 31, 2018[.]" *See* Alta Mesa Form 10-K dated August 26, 2019. The report identified ***sixteen*** "material weaknesses" in Alta Mesa's internal control over financial reporting, including "[i]neffective controls over the identification and processing of relevant and reliable information"; "[i]neffective controls over the financial statement close and disclosure process, including the completeness, existence and accuracy of the financial information"; and "[i]neffective management reviewcontrols over various complex accounting estimates." *See* Alta Mesa Form 10-K dated August 26, 2019. "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." *See* Alta Mesa Form 10-K dated August 26, 2019.

102. Alta Mesa's 2018 annual report also echoed AMH's 2018 annual report in disclosing that "[t]he SEC is conducting a formal investigation into, among other things, the facts involved in the material weakness in our internal controls over financial reporting and the

impairment charge disclosed elsewhere in our financial statements." *See* Alta Mesa Form 10-K dated August 26, 2019.

103. Two weeks after Alta Mesa filed its 2018 10-K, its interim CEO, Defendant Hackett, resigned.

104. Alta Mesa and several related entities filed for Chapter 11 bankruptcy protection on September 11, 2019.

105. Alta Mesa's securities have been delisted from the NASDAQ and are now traded over the counter.

106. During the Bankruptcy Proceeding, Alta Mesa's upstream and midstream assets sold for, at most, $240 million—about 6% of Alta Mesa's claimed post-merger value of $3.8 billion. (No. 19-cv-957, ECF No. 160 at 15 n.9.)

**G. Alta Mesa's Collapse Resulted From Defendants' Intentional Misconduct**

107. Alta Mesa experienced a massive drop in value during its brief time as a listed company, writing down over 80% of its market value after its first year in existence and selling assets in bankruptcy for (at most) $240 million that had been valued at $3.8 billion when Silver Run merged with AMH and Kingfisher less than two years before. Alta Mesa also acknowledged serious, systemic deficiencies in its financial reporting that created "a reasonable possibility that a material misstatement of the company's annual or interim financial statements" would not have been "prevented or detected on a timely basis." Among other things, those reporting deficiencies triggered an SEC investigation.

108. The steady stream of Alta Mesa's bad financial results after the merger between Silver Run, AMH, and Kingfisher, and Alta Mesa's ultimate collapse into bankruptcy, resulted from an intentional overstatement of the value of AMH and Kingfisher that began well before the

merger. At bottom, Defendants knew that the assets of AMH and Kingfisher should not have been valued as highly as they were at the time of the merger between Silver Run, AMH, and Kingfisher. Rather, Defendants intentionally overstated the value of AMH and Kingfisher before the merger in order to ensure that Silver Run's shareholders approved the merger. Defendants continued to deceive investors after the merger, including to inflate Kingfisher's value in order to position it to be spun-off in an IPO as a separate midstream company.

### 1. **Before the Merger, Defendants Systematically Looted AMH for the Benefit of Kingfisher.**

109. Even before the merger between Silver Run, AMH, and Kingfisher, certain of the Defendants were already manipulating the corporate structure of AMH for their own self-interest.

110. In 2014, AMH decided to increase its investment in the STACK. At that time, AMH utilized independent companies for its midstream needs, such as gathering, trucking and marketing.

111. ARM, HPS and Chappelle undertook to create a new company to serve as AMH's midstream gatherer in the STACK. This company—Kingfisher Midstream, LLC—would construct a gathering pipeline, gas processing plant, and crude oil transportation system. AMH would be the "anchor" producer for Kingfisher.

112. Kingfisher was funded through investments by ARM, HMI, and HPS. Chappelle and Ellis owned a large stake in Kingfisher.

113. Early presentations of the Kingfisher transaction detailed that the fees AMH would pay Kingfisher were substantially higher than the fees that AMH was paying its then existing midstream gatherer. AMH failed to pursue competitive offers from gatherers other than Kingfisher, and actively rejected offers from other midstream gatherers, including those offering lower rates than Kingfisher.

114. On August 31, 2015, AMH and Kingfisher entered into the 2015 Gas Gathering and Processing Agreement and Crude Oil Gathering Agreement (together, the "2015 Gathering Agreements"). Incredibly, Chappelle signed the agreements on behalf of *both* AMH and Kingfisher.

115. The 2015 Gathering Agreements favored Kingfisher and were unfair to AMH. The rates and fees that AMH had to pay Kingfisher under the 2015 Gathering Agreements were substantially above then-market rates.

116. AMH's managers openly questioned the exorbitant fees that AMH had to pay Kingfisher under the 2015 Gathering Agreements. Notably, Kingfisher was charging other customers substantially less than it was charging AMH—despite that AMH provided the overwhelming majority of Kingfisher's business.

117. Making matters worse, on December 1, 2016, AMH and Kingfisher executed amended agreements that were designed to attempt to insulate the agreements from challenge should AMH ever declare bankruptcy.

118. The amended agreements also required Kingfisher to construct a system to gather up to 50,000 barrels per day from AMH.

119. But Kingfisher never constructed this system. Despite this, Kingfisher charged AMH for every barrel of oil that AMH paid another party to transport. This meant that Kingfisher was paid for doing nothing, and AMH was paying twice to move the same barrel.

120. In effect, the value of AMH's production assets were being diverted to Kingfisher and Kingfisher's owners, including HPS and ARM.

121. Between June 2016 and October 2019, AMH paid Kingfisher over $120 million of above-market fees, as well as millions of more dollars for transporting oil that Kingfisher never

transported.

122. Prior to the Merger, Defendants attempted to push EBITDA to Kingfisher to increase the overall valuation of the proposed combined entity. Increasing EBITDA at Kingfisher was important to the overall value of the Merger because midstream companies are valued at higher multiples than upstream companies. For example, an internal AMH email from Vice President of Corporate Development Tim Turner to, among others, Defendant Chappelle, dated November 29, 2017 stated: "Whether its stage spacing gallons per food or my all-time favorite pounds per food, companies get valued higher if they're pumping more. It doesn't matter if it's economic waste!" Another internal email from Alta Mesa's CFO McCabe to Defendant Chappelle in August 2018 confirmed this notion, stating Alta Mesa's "desire was to get EBITDA into KFM since it all rolls up to AMR."

### 2. <u>Before the Merger, Defendants Knew That the Production Projections Made by AMH and Alta Mesa Were Not Achievable.</u>

123. Determining the optimal number of wells to drill is a crucial part of developing an oil field. There is a finite amount of recoverable gas and oil in any given reservoir. Generally, drilling more wells will produce oil and gas faster. But each well is expensive to drill, and drilling numerous wells close together can decrease each well's productivity. Thus, a drilling company must determine the optimal number of wells to drill per drill spacing unit ("section") to maximize return.

124. In drilling a particular section, a certain minimum number of wells must be drilled to extract recoverable oil and gas from that section. Drilling more wells in that section will likely increase total near-term production from the section, but will also decrease the average estimated ultimate recovery ("EUR") per well in that section. This is because close spacing between wells will cause some of the wells to draw oil and gas from the same finite source. This interference

lowers the average production volume per well.

125. The number of wells drilled per section and their respective average EUR directly affects the economic return from a given reservoir. The net present value of the reservoir may be increased by drilling more wells, because more wells will shorten the production life of the reservoir means that revenue is earned sooner. But each additional well costs money to drill and complete, which must also be factored into the net-present-value analysis.

126. Before the Merger, most of Alta Mesa's wells were single wells, *i.e.*, one well per section.

127. In 2014, Alta Mesa began multi-well test patterns. These test wells were of two types: child patterns and sibling patterns. A child pattern consists of one existing producing well (the parent), and several smaller child wells drilled later in time but in close proximity to the parent. A sibling pattern consists of multiple new parent wells drilled at the same time.

128. Between 2014 and early 2017, Alta Mesa completed seven initial multi-well test patterns. Six of those test patterns started producing oil by the summer of 2017, and the final pattern started producing oil from three of its four wells in September 2017.

129. As of December 2017, only two test patterns had an average EUR per well of around 250 MBO, and both of those were sibling patterns. These two test patterns also only had three wells, which created less potential for inter-well interference. Thus, the results of these two patterns could not be reliably extrapolated to drilling patterns with more wells per section. The average EUR of the remaining sibling patterns was well below 250 MBO. The average MBO of the two child patterns was far below 250 MBO: one had an EUR of 78 MBO and the other had an EUR of 64 MBO. And the average EUR for the child wells in those patterns was even lower.

130. By August 2017, Chappelle, Ellis, and Turner knew that none of the child wells in

the test patterns had anywhere close to an EUR of 250 MBO.

131. Chapelle and Ellis knew as early as June 2017 that there was a difference in production between those patterns that had three wells versus those patterns with six or more wells in a section. Turner told Chappelle in June 2017 that there "could be an argument" that the two test patterns with an EUR of around 250 MBO achieved those results because they only had three wells per section. Chappelle agreed with this assessment. Chappelle also told Ellis in June 2017 that a test pattern that would be drilled later in 2017 would be a "very important test" because it would be an eight-well child pattern, as opposed to a three-well sibling pattern, like the patterns that had EUR of around 250 MBO.

132. Chappelle, Ellis, and Turner also knew that drilling more wells in a section could cause well interference, lowering the production from certain wells in that section. These concerns arose in November 2017 in connection with one of the test patterns that had an EUR of only about 150 MBO.

133. On November 1, 2017, Gene Cole, Alta Mesa's Vice President and Chief Technology Officer, emailed Ellis, Turner, and others: "So the west half of the huntsmen has 4 wells for 585mbo." Turner responded the next day with a spreadsheet showing that one of the wells in the Huntsman pattern had an EUR of only 60 MBO and another well had an EUR of only 40 MBO.

134. Cole emailed that "We know part of the reason the upper landings are producing more oil in the [H]untsman is because they are taking oil from the Osage." Turner replied on November 3, 2017 that "[i]t seems there is also some connectivity between the Osage and Meramec that is natural and/or hydraulically induced." The Osage and the Meramec are two reservoir formations that are stacked on top of each other.

135. Later in November, Chappelle, Turner, and Kevin Bourque, Alta Mesa's VP of Drilling and Administration, had another email exchange where Ellis and Turner discussed the possibility that drilling in the Osage or Meramec formations could reduce the recoverability of oil in the other formation.

136. The 2018 drilling program was based on the premise that Alta Mesa had more than 4,000 gross drilling locations, could drill up to 12 wells per section, and could recover 250 MBO from each well in the section. Thus, Alta Mesa assumed that even multi-well patterns of six or more wells per section would produce oil, on average, in line with a well with an EUR of 250 MBO. This linear extrapolation of a per-well EUR for sections with up to 12 wells was unsupported by any data.

137. In 2018, Alta Mesa planned to drill approximately 200 wells, almost double the amount of wells it drilled in 2017. More than 75% of these wells would be part of multi-well patterns. And the majority of the new wells would be child wells. By comparison, Alta Mesa drilled zero child wells in 2016 and 30 child wells in 2017 (22 of which started producing in the fourth quarter of 2017).

138. Alta Mesa also planned to increase the number of drilling rigs, the operation of which is one of the primary costs associated with drilling wells. Alta Mesa planned to steadily increase the number of rigs to ten by the end of 2018, resulting in an average of eight rigs in operation throughout the year. By contrast, in 2017, Alta Mesa deployed four to six drilling rigs.

139. Chappelle, Ellis, and Hackett knew that the 2018 drilling program was not based on reasonable assumptions. To begin, they knew that there were industry reports in mid-2017 of "less than anticipated type curves for the child wells." Moreover, Chappelle, Ellis, and Hackett knew that Alta Mesa's previously completed child patterns had performed poorly and that more

testing would be "very important" to determine the viability of the 2018 drilling plan. Hackett testified during Alta Mesa's bankruptcy that the results from the prior well patterns "were indeterminate because we hadn't actually felt that we had executed on those properly." All told, Alta Mesa had no results from well patterns evidencing that child patterns with four to ten wells per section would achieve production consistent with an EUR of 250 MBO.

140. On February 12, 2018, Alta Mesa's Board met to approve its 2018 drilling program. There is no evidence that the Board considered whether the results from the well pattern tests supported the proposed drilling program. Had the Board reviewed the assumptions underlying the drilling program, it would have been obvious that the data did not support the program. Nonetheless, the Board approved the 2018 drilling program.

141. In March 2018, Turner and Defendant Chappelle reviewed documents showing that cumulative oil production from patterns completed in late 2017 and early 2018 were falling below production expectations within 40 to 70 days of first oil.

142. On March 22, 2018, Defendant Chappelle circulated to Defendant Ellis and others a report titled, "STACK Meramec Spacing: Co-Completed Wells Shine, Child Wells Decline." One of the key points that the report noted was that "tighter spacing increases the deterioration in the rates of child wells compared to the average parent well for a given operator, region and vintage." Of course, Defendants Chappelle and Ellis had already known this as early as mid-2017.

143. On April 7, 2018, Defendant Chappelle emailed Turner and Bourque to discuss child wells. Bourque responded: "My first thought: I think most of our offset operators are going to be saying that they're seeing 70-90% of the parents when drilling infills [child wells] from the informal conversations I've had. I don't believe most expect our infill to be 100% of the original single wells in a section," adding that "Mike [Ellis] called it 80% or 200mbo."

144. Thus, by April 2018, Defendants Chappelle and Ellis agreed that Alta Mesa's child wells would have at least a 20% lower EUR than their parent wells. But the 2018 drilling program was predicated on the assumption that *each* well would have an average EUR of 250 MBO. By recognizing that the actual EUR of child wells would be around 200 MBO, it was assured that the 2018 drilling program would fail.

145. Moreover, Turner admitted in an early April 2018 email to Defendant Chappelle that the initial pattern tests did not provide a basis to assume that child wells would meet the production estimates. Defendant Chappelle asked, "How do we reconcile that with the correlation we consistently showed with >TC [250 MBO] @ 1500' [spacing?]" Turner replied: "Patterns are still early. The correlation we showed was spacing test," *i.e.*, the initial pattern tests.

146. On April 16, 2018, Turner emailed Defendant Ellis and others an Excel spreadsheet entitled "Pattern Analysis," and wrote, "Some info to ponder on . . . sorted on number of wells drilled." Even after revisions, the results still showed that Alta Mesa was expecting an average EUR per well in its patterns of only 183 MBO.

147. The spreadsheet showed that most of Alta Mesa's STACK drilling patterns had an EUR below 200 MBO. The outlier patterns with an EUR above 200 MBO either had four or fewer wells per section, were sibling patterns with only three wells per section, or had just started producing on April 1, 2018, meaning that insufficient data existed to determine a reliable pattern EUR.

148. A day later, on April 17, 2018, an Alta Mesa reservoir engineer emailed Defendant Ellis: "Sooner or later, the number of infill/child wells will surpass the number of parent wells due to drilling inventory. However, we have seen (some) poor performance in infill wells, which is likely due to the depletion effects of the existing parent well and inter-/intra-well production

competition with both parent and other infill wells."

149. On July 5, 2018, Turner emailed Defendant Chappelle stating that "[W]e are facing the cold reality that the child well mean is in the 105-160 mbo range depending on how you slice the data," and observing that "[c]learly, we've had trouble hitting production targets and this seems to be a combination of shut-ins, filling wells, and lower IP's [initial productions] on child wells."

150. On July 27, 2018, Turner sent another email to Defendant Chappelle on "Child/Sibling EUR's," stating that the "distribution was ~177 MBO," and asking whether Defendant Chappelle nonetheless wanted to assume a "200 MBO or 225 MBO case." Defendant Chappelle responded that he wanted to go with a 225 MBO case for child and sibling wells.

151. On July 31, 2018, Turner circulated a "Type Well Process and Review" presentation to Defendant Ellis, Bourque, and others. That presentation showed that child and sibling wells were producing at an average of 150 to 180 MBO per well, far below the 250 MBO EUR estimate on which Alta Mesa's drilling plan was based.

152. In addition, Defendants also manipulated the reserve and financial projections of AMH and Alta Mesa by using drilling techniques that fell outside the industry standard. Defendants used these unconventional and unsustainable drilling methods, without disclosure to the investing public, including Orbis, in order to inflate short-term profits (at the expense of long-term drilling prospects) thereby inducing Silver Run investors to vote in favor of the merger with AMH and Kingfisher.

153. The Class Action Complaint includes the accounts of two former AMH production engineers, who allege that AMH departed from industry standards by: (i) drilling more wells per well pad than was optimal for AMH's acreage; (ii) drilling its wells too close together, which required the use of S-shaped rather than L-shaped wells; and (iii) using electronic pumps ("ESPs")

that temporarily increased wells' production rates but shortened the wells' lifespans. These former AMH production engineers further allege that these departures from industry standards, which were not disclosed to the investing public, including Orbis, were not based on engineering analysis, but were instead imposed by Defendants in an effort to artificially inflate AMH's oil reserves and to temporarily inflate short-term production in a manner that Defendants knew would undermine the long-term viability of AMH's wells. As one engineer put it, management was "desperate to make numbers."

154. Instead of disclosing that AMH's reserve and financial projections were based on departures from industry standards, the Proxy stated that AMH's estimates followed SEC regulations and established industry practices. *See* Alta Mesa Form DEFM14A dated January 19, 2018.

155. These practices continued after Silver Run merged with AMH and Kingfisher and became Alta Mesa. As previously noted, Alta Mesa's first financial disclosures, filed in March of 2018, "dramatically reduced" the Proxy's EBITDA and production estimates. Rather than disclosing the fact that Alta Mesa was never able to meet earlier projects, for the reasons alleged above, Defendant Chappelle, then Alta Mesa's CEO, reassured analysts and investors on an earnings call that "the problems were temporary" and that the revised estimates only represented a "two-month shift in the calendar" for AMH and a "six-month shift in the calendar" for Kingfisher. To continue to hide its fraud and further deceive the investing public, including Orbis, Alta Mesa sustained its undisclosed practices that inflated short-term production at the cost of the long-term viability of its operations.

156. In particular, in an attempt to work around the basic fact—known to Defendants since prior to the Merger—that the 250 MBO average production estimate was unachievable, Alta

Mesa tried to rely on expensive ESPs—electrical submersible pumps—to increase performance from poorly performing wells. ESPs are a mechanical artificial-lift method used to increase the flow of liquids to the well surface, but they do not guarantee an increase in oil production. ESPs are expensive, prone to breakdown, and not suitable for the drilling environment of the STACK. Although ESPs are used in other drilling fields, such as the Gulf Coast, the STACK has a higher than normal sand content, which increases clogging, necessitating costly repairs. All told, each ESP could cost up to $800,000, factoring in repair costs.

157. Prior to 2018, Alta Mesa had little experience with ESPs. In August 2017, Alta Mesa installed ESPs on two wells that seemed like good candidates for the technology. As Bourque explained to Defendant Hackett in February 2018, "We use ESPs selectively, but only after we understand the character of the well in terms of productivity—the unusual wells that have high water cut and high fluid rates over an extended period." He added: "I'm not sure I'd see the value in using ESPs early with all the associated costs, given our consistent performance with gas lift. My preference is to pay for the lift system once instead of twice."

158. The Class Action Complaint includes allegations from a former Alta Mesa production engineer that after poor drilling results in early 2018, Defendant Chappelle ordered his team to immediately identify 25 wells that were candidates for deploying additional electronic pumps, despite the engineer's repeated warnings that the electronic pumps were not an economical or effective solution for Alta Mesa's wells. Indeed, although such pumps are utilized in other oil drilling fields, such as on the Gulf Coast, the pumps were not appropriate for the STACK formations in which Alta Mesa was drilling. By the end of 2018, over 80 ESPs were installed.

159. Unsurprisingly, although ESPs did modestly increase well production when first installed, production soon dropped off, cancelling out any early boost. And issues with sand

clogging the pumps emerged almost immediately, forcing frequent shut-ins and requiring costly repairs. Thus, the use of ESPs materially increased Alta Mesa's capital expenditures, and failed to improve overall well production.

160. Alta Mesa never disclosed its aberrant drilling practices or the effects of those practices on Alta Mesa's long-term production prospects. Instead, Defendants were focused on trying to prop up Alta Mesa's stock price in order to salvage their plans to spin off Kingfisher as an independent midstream company through an IPO of its own. Kingfisher's profitability was inextricably tied to AMH's production, because Kingfisher had few prospects for diversification. Indeed, even before the merger, beginning in 2017 Kingfisher knew that multiple large third-party producers had delayed drilling on acreage served by Kingfisher because those operators also realized the STACK play was not as lucrative as anticipated.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. Materially False and Misleading Statements About AMH/Alta Mesa Oil Production and Drilling Methods

161. On August 16, 2017, after market close, Alta Mesa issued a press release, filed with the SEC on Form 8-K (the "August 16, 2017 8-K"), announcing that it had entered into an agreement to merge with AMH and Kingfisher. In the August 16, 2017 8-K, Defendant Hackett stated: "We formed Alta Mesa with the objective of acquiring low-breakeven, stacked-pay, oil-weighted assets, preferably with an integrated related midstream platform." Defendant Chappelle stated: "We see this as a tremendous way to continue our evolution as a low-cost, high-value producer in the STACK." The press release further stated that "[b]ased upon production through the second quarter of 2017, Alta Mesa expects EURs at year end to exceed 650 MBOE per well or approximately 140 BOE per foot of lateral."

162. The foregoing statements were materially false and misleading when made, for

among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the 650 MBOE per well guidance was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

163. On an August 17, 2017 conference call (the "August 17, 2017 Conference Call"), Defendant Hackett stated that the AMH and Kingfisher merger satisfied the "investment criteria" presented on a slide deck distributed in connection with the call. That slide referred to "[h]igh margin core basin with low field break-even events [with] deep inventory."

164. The foregoing statement was false and misleading when made because, among other reasons, it did not disclose that nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life.

165. During the August 17 Conference Call, Defendant Chappelle stated that "We have over 200 wells that we've drilled [in the STACK] and we've demonstrated the value and we have confidence in the upside. As an illustration of that, at the end of the second quarter, we had drilled on the order of 200 wells. Of those, over 160 were on production, and of that number, about 114 had sufficient production history to give us confidence that at the end of this year, our year-end reserves will reflect better than 650,000 BOE."

166. The foregoing statement was false and misleading when made because, among other reasons, it did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same

time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the 650,000 BOE guidance was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

167. On January 19, 2018, Silver Run Acquisition Corporation II (which would become Alta Mesa), filed with the SEC the definitive proxy statement relating to its merger with AMH and Kingfisher. The Proxy contained numerous materially false and misleading statements.

168. The Proxy stated that "Alta Mesa's operations involve the use of the latest horizontal drilling, completion and production technologies, as developed by Alta Mesa and its service providers, in an effort to improve efficiencies in recovery of hydrocarbons. Use of these new technologies may not prove successful and could result in significant cost overruns or delays or reduction in production, and in extreme cases, the abandonment of a well." The Proxy further stated that "certain of the new techniques Alta Mesa is adopting may cause irregularities or interruptions in production due to offset wells being shut in and the time required to drill and complete multiple wells before any such wells begin producing."

169. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life.

170. The Proxy also stated that "[o]f the 220 [STACK] wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's management confidence that Alta Mesa's type well EUR is greater than 650 MBOE."

171. The foregoing statement was false or misleading when made, for among other reasons, it did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the 650,000 BOE guidance was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

172. The Proxy further stated that AMH's estimated average net daily production for 2018 was 38,510 barrels and that its estimated average net daily production for 2019 was 68,900 barrels.

173. The foregoing statement was false or misleading when made, for among other reasons, it did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the estimated average net daily production was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

174. The Proxy also stated that:

> AMH's policies and practices regarding internal controls over the recording of reserves are structured to objectively and accurately estimate its oil and gas reserves quantities and present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices used by independent engineering firms and its peers and in accordance with the 2007 Petroleum Resources Management System sponsored and approved by the Society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers.

175. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that Alta Mesa was not objectively and accurately measuring its oil and gas reserves in compliance with SEC guidance and industry practice, including because (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) Alta Mesa's production estimates were not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

176. On February 21, 2018, Defendant Chappelle presented at the Enercom Dallas Oil & Gas Conference about Alta Mesa's STACK drilling. The slide deck for that presentation (the "February 21, 2018 Presentation") stated that Alta Mesa's STACK "Multi-well development projects initiated in 2017; previous pattern tests validate approach," that "[c]onsistency and geographic breadth of well results underscores repeatable development," and that "[s]pacing test pilots establish basis for development approach."

177. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "repeatable development" and the "development approach" were not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

178. On March 29, 2018, Alta Mesa issued a press release in which Defendant Chappelle

stated that Alta Mesa had "de-risked [its] acreage with . . . a comprehensive scientific and engineering effort to begin systematic development with multi-well patterns" and that its "type curve has been approximately 650 MBOE per well."

179. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the 650 MBOE per well production rate was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

180. On March 29, 2018, Alta Mesa also released a slide presentation, which Defendant Chappelle presented during a conference call with investors and analysts, entitled "Q4 2017 Earnings / 2018 Operational Update and Guidance." The presentation contained, under headings entitled "STACK Pure Play" and "Sustainable, Advantaged Cost Structure," the following bullet-pointed statements: "Investment de-risked by 250+ horizontal wells with resilient, repeatable well economics," "Consistency and geographic breadth of well results underscores repeatable development," "Multi-well development projects initiated in 2017," "Drilling, geoscience, completions and production teams delivering low cost, highly productive wells at > 2 wells per rig-month," and "Capital and operating cost structure minimized with multi-well pattern development . . . ."

181. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while

at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "resilient, repeatable well economics," "repeatable development" of wells, and "highly productive wells" were not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

182. On the March 29, 2018 conference call, Defendant Chappelle stated that "Alta Mesa has now drilled over 300 wells in a concentrated asset base of scale and we have strong confidence in the long-term economic productivity from the rock. Because of this confidence, we have now transitioned from delineation to multi-well pad development in Kingfisher County." Defendant Chappelle also stated that "Our production growth was accomplished through consistent operational execution, shorter completion cycle times, improving efficiencies and continued solid performance from new wells. The planning and now execution of our now multi-well pad drilling and completions has yielded significant operational efficiencies . . . ."

183. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "long-term economic productivity" and "significant operational efficiencies" from the wells were not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

184. Alta Mesa's Form 10-K filed with the SEC on March 29, 2018 (the "2017 Form 10-K") stated that "Our operations involve the use of the latest horizontal drilling, completion and

production technologies, as developed by us and our service providers, in an effort to improve efficiencies in recovery of hydrocarbons. Use of these new technologies may not prove successful and could result in significant cost overruns or delays or reduction in production, and in extreme cases, the abandonment of a well." The 2017 Form 10-K also stated that "certain of the new techniques we are adopting may cause irregularities or interruptions in production due to offset wells being shut in and the time required to drill and complete multiple wells before any such wells begin producing."

185. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life.

186. The 2017 Form 10-K also included a Risk Factor that Alta Mesa's business "involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application" and that its business "depend[s] on successful exploration, exploitation, development and acquisitions to maintain reserves and revenue in the future."

187. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that Alta Mesa's drilling techniques were not the latest available horizontal drilling technology, but were instead work-arounds designed to increase short-term production while jeopardizing future reserves and revenues.

188. On May 14, 2018, Alta Mesa released a slide presentation, which Defendant Chappelle presented during a conference call with investors and analysts, entitled "First Quarter

2018 Operational Update." The slide presentation included the statements "Multi-well development pattern results across field are favorable," "Applied learning from pattern tests – 80% of 2018 plan on multi-well pads," "Development program designed to maximize value by optimizing production . . . ." and included a slide entitled "Production Optimization" that included the use of ESPs for "production acceleration."

189. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "resilient, repeatable well economics," "repeatable development" of wells, and "highly productive wells" were not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

190. During the May 14, 2018 conference call (the "May 14, 2018 Conference Call"), Defendant Chappelle also reaffirmed Alta Mesa's 2018 guidance, stating that "We have confidence in presenting operating results such as production, revenue, expenses as those numbers will not change." Orbis Investments viewed this re-iteration of Alta Mesa's 2018 guidance as the biggest takeaway from the May 14, 2018 Conference Call.

191. The foregoing statement was false or misleading when made, for among other reasons, because Alta Mesa could not achieve its 2018 guidance given that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) because of erroneous assumptions for

optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

192. On May 21, 2018, Alta Mesa filed with the SEC its Form 10-Q for the quarter ending March 31, 2018 (the "1Q 2018 Form 10-Q"). The 1Q 2018 Form 10-Q incorporated by reference the Risk Factor from the 2017 Form 10-K set forth above in Paragraph 186.

193. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 187.

194. In a slide presentation for the J.P. Morgan Energy Conference, dated June 18-20, 2018 (the "June 2018 Presentation"), Alta Mesa stated "Multi-well development pattern results across field are favorable" and included a slide stating "ESP (production acceleration)."

195. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "multi-well" development was not "favorable," including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

196. On August 14, 2018, Alta Mesa released a slide presentation, which Defendants Chappelle and Hackett presented during a conference call with investors and analysts, entitled "Second Quarter 2018 Update" (the "Second Quarter 2018 Update Presentation"). That presentation stated that Alta Mesa was "[p]ositione[d] for 2019+ Ongoing" because of "[c]ontinuous multi-discipline efforts to define and optimize pattern drilling, completion, and production operations" and that its "[p]roduction [t]rajectory" was "strong," because of "Ongoing

coordination and optimization of multi-well drilling & completion," that "Multi-well development pattern results continue to be favorable," and that Alta Mesa was "Systematically deploying ESP/jet pump."

197. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "multi-well" drilling and development were not "favorable" or "optimized," including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

198. On August 15, 2018, Alta Mesa filed with the SEC its Form 10-Q for the quarter ending June 31, 2018 (the "2Q 2018 Form 10-Q"). The 2Q 2018 Form 10-Q incorporated by reference the Risk Factor from the 2017 Form 10-K set forth above in Paragraph 186.

199. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 187.

200. On August 20, 2018, Alta Mesa management presented at the Enercom Denver Oil & Gas Conference (the "August 20, 2018 Presentation"). On information and belief, Defendant Chapelle and/or Defendant Hackett gave this slide presentation. Alta Mesa management, including Defendants Chapelle and Hackett possessed the ultimate authority over the content of the August 20, 2018 Presentation.

201. The August 20, 2018 Presentation described Alta Mesa as having "transitioned to multi-well pads," and possessing a "[s]trong [p]roduction [t]rajectory," based on "[o]ngoing coordination and optimization of multi-well drilling and completion." The August 20, 2018

Presentation also touted Alta Mesa's "[u]pstream [o]perational [e]xcellence," including "[c]ost control" and "improved efficiencies in spud to rig release."

202. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "multi-well drilling" and completion were not "cost control[led] or "optimized," including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

203. The August 20, 2018 Presentation further stated that "[m]ulti-well development pattern results continue to be favorable" and that "[i]nitial results from 21 patterns give distribution of outcomes for insights into well placement, completion design, and production methods."

204. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that "multi-well" development, including the results from the 21 patterns referenced, was not "favorable," including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

205. The August 20, 2018 Presentation spoke of Alta Mesa's "[p]attern [d]rilling [o]ptimization" through a "[f]ocus on coordination, cost control, [and] minimizing offset production impact."

206. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same

time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) "pattern drilling" was not "optimized," nor was there sufficient control on "coordination" or "cost control," including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

207. On November 14, 2018, Alta Mesa filed its Form 10-Q with the SEC for the quarter ending September 31, 2018 (the "3Q 2018 Form 10-Q").

208. The 3Q 2018 Form 10-Q incorporated by reference the Risk Factor from the 2017 Form 10-K set forth above in Paragraph 186.

209. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 187.

**B. Materially False and Misleading Statements About Kingfisher's Prospects and Expected Revenue**

210. The August 16, 2017 8-K stated that Kingfisher had "a leading position in the STACK play, with Alta Mesa serving as its anchor producer" and that "with approximately 300,000 gross dedicated acres from Alta Mesa and five other third party customers," Kingfisher was "uniquely positioned to capitalize on the increasing development activity in the STACK."

211. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

212. During the August 17 Conference Call, Defendant Chappelle also stated that "when it comes to the importance of Kingfisher Midstream to Alta Mesa, it's simply a strategic competitive advantage for us. We've got a purpose-built system that allows us to operate confidently in a multi-well development mode, we've got efficient processing, and we have access that's assured to the interstate markets during a time where there could be periodic constraints due to the large-scale growth in the area." Defendant Chappelle further added that Kingfisher was "rapidly expanding," "positioned to capture volume growth from the STACK," and "well positioned to serve other operators" and that Kingfisher was expected to increase its EBITDA in 2018 to $185 million and to $318 million in 2019.

213. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

214. The Proxy stated that "Kingfisher's revenue-producing operations are geographically concentrated in the STACK play, causing it to be disproportionally exposed to risks associated with regional factors" and that "[t]he concentration of Kingfisher's operations in this region increases Kingfisher's exposure to unexpected events that may occur in this region such as natural disasters or labor difficulties."

215. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that beginning in 2017, Kingfisher knew that customers had

delayed drilling on STACK acreage served by Kingfisher, and thus that the risks warned of had already come to pass.

216. With respect to Kingfisher, the Proxy also disclosed that "96.9% of Kingfisher's revenue were derived from production out of wells operated by Alta Mesa," but that "Kingfisher's concentration to Alta Mesa is expected to decrease over time as Kingfisher provides midstream services for additional producers."

217. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements, and thus, even if Kingfisher provided services to additional producers, the terms of those services would not be as advantageous to Kingfisher as its agreements with Alta Mesa.

218. The Proxy also stated that Kingfisher was "rapidly expanding," that it had "the potential for a subsequent midstream initial public offering," and estimated Kingfisher's EBITDA for 2018 of $185 million and for 2019 of $318 million.

219. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

220. The February 21, 2018 Presentation included the statement: "Kingfisher

Midstream (KFM) purpose built and highly synergistic; flow assurance de-risks production growth."

221. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements.

222. As to Kingfisher, the 2017 Form 10-K included as risk factors that "The primary factors affecting our ability to connect new wells to our gathering facilities include our success in contracting for existing supplies that are not committed to other systems and the level of drilling activity near our gathering system, that "our future growth will depend in part upon whether we can contract for additional supplies at a greater rate than the rate of natural decline in our current supplies" and that "Although drilling activity improved during 2016 and 2017, we could see downward pressure on future drilling activity in the STACK play if commodity prices decline, which may result in lower volumes."

223. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that the warned of risks had already come to fruition, given that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

224. The 2017 Form 10-K also included as a risk factor as to Kingfisher that "The renewal or replacement of our existing contracts with our midstream customers at rates sufficient

to maintain or increase current revenues and cash flows depends on a number of factors beyond our control, including competition from other midstream service providers and the price of, and demand for, crude oil, natural gas and NGLs in the markets we serve. The inability of our management to renew or replace our current contracts as they expire and to respond appropriately to changing market conditions could have a negative effect on our profitability."

225. The foregoing statement was false and misleading when made, for among other reasons, because it did not disclose that the warned of risk had already come to fruition, given that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

226. The 1Q 2018 Form 10-Q incorporated by reference the Risk Factors from the 2017 Form 10-K set forth above in Paragraphs 222 and 224.

227. The foregoing statements were false or misleading when made for the reasons set forth above in Paragraphs 223 and 225.

228. In the June 2018 Presentation, on a slide entitled "Alta Mesa's Trajectory," under the heading "2018," the presentation stated "Execute on midstream business development" and under the heading 2019, "Midstream business achieves scale for IPO or other alternatives."

229. The foregoing statement was false and misleading when made, for among other reasons, because it did not disclose that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements;

(ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

230. On a slide entitled "Alta Mesa's Trajectory," under the heading "2018," the Second Quarter 2018 Update Presentation stated "Execute on midstream business development" and under the heading 2019, "Midstream business achieves scale for IPO or other alternatives."

231. The foregoing statement was false and misleading when made, for among other reasons, because it did not disclose that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

232. The 2Q 2018 Form 10-Q incorporated by reference the Risk Factors from the 2017 Form 10-K set forth above in Paragraphs 222 and 224.

233. The foregoing statements were false or misleading when made for the reasons set forth above in Paragraphs 223 and 225.

234. The 3Q 2018 Form 10-Q incorporated by reference the Risk Factors from the 2017 Form 10-K set forth above in Paragraphs 222 and 224.

235. The foregoing statements were false or misleading when made for the reasons set forth above in Paragraphs 223 and 225.

### C. Materially False and Misleading Statements About Alta Mesa's Internal Controls

236. In response to the massive accounting scandals at Enron, WorldCom, Global

Crossing and Tyco, Congress enacted sweeping reforms to restore integrity to the financial markets and regain investors' trust and confidence in those markets. Many such reforms were included in the Sarbanes-Oxley Act of 2002 ("SOX") in an effort to prevent a recurrence of the abusive practices that had caused billions of dollars of losses to investors in public companies. One of the cornerstones of these reforms was the requirement that companies set up a sound financial accounting system that would generate reliable, verifiable financial reports; furthermore, one of the key features of this requirement is that the company's principal officers – typically, the CEO and the CFO – were required to certify in writing that they have undertaken sufficient investigation to confirm that the company has indeed established the requisite financial accounting system, that it has produced accurate financial statements that fully and fairly identify the company's financial position, and the company's system of internal disclosure controls and procedures are effective and capable of raising any red flags and providing the signing officers with all the material information they need to know the company's true financial condition.

237. Accordingly, when a CEO and CFO sign a SOX-required certification attesting that the company's internal control function over its financial reporting is effective, and that the financial statements produced by the company's accounting system are reliable and verifiable in presenting the company's true financial condition, they are implementing that crucial step of the congressional reforms designed to restore confidence in capital markets and in individual companies' earnings reports. This is not a mere rote exercise by which corporate officers can dodge their grave responsibilities by simply checking a box and signing on the dotted line to rubber-stamp compliance; on the contrary, Congress and the capital markets fully expect that senior management has discharged their highly critical duty by actively confirming the company's disclosure and financial controls. In addition, by his or her signature, the certifying officer is

broadcasting to investors that it has disclosed any fraud or is not aware of any fraud. Investors rely on the accuracy and transparency of these disclosures when determining whether to invest.

238. Defendants repeatedly certified that they had established effective internal controls over Alta Mesa's financial reporting as well as effective disclosure controls and procedures for Alta Mesa.

239. The 2017 Form 10-K stated that Alta Mesa's "Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15 (e) and 15d-15 (e) under the Exchange Act) were effective."

240. The foregoing statement was false or misleading when made, for among other reasons, because Alta Mesa did not have effective disclosure controls and procedures, as demonstrated by the Company's February 25, 2019 announcement, which resulted in, among other things, a $3.1 billion write-down.

241. Defendant Chappelle certified that the 2017 Form 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

242. The foregoing certification was false or misleading when made because, as shown herein, the 2017 Form 10-K contained numerous untrue statements of material fact and/or omitted numerous material facts necessary to make statements not misleading.

243. Defendant Chappelle also certified that "The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

244. The foregoing certification was false or misleading when made, because Alta Mesa did not have adequate disclosure controls and procedures or adequate internal control over financial reporting, as demonstrated by the Company's February 25, 2019 announcement, which resulted in, among other things, a $3.1 billion write-down.

245. Along with the above certifications, Defendant Chappelle also provided a SOX certification that the 2017 Form 10-K "fully complies with requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

246. This certification was false or misleading when made because the 2017 Form 10-K did not present fairly and in all material respect the financial condition and results of Alta Mesa and because Alta Mesa did not have adequate disclosure controls and procedures or adequate internal control over financial reporting, as demonstrated by the Company's February 25, 2019 announcement, which resulted in, among other things, a $3.1 billion write-down.

247. The 1Q 2018 Form 10-Q contained the same statement set forth above in Paragraph 239.

248. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 240.

249. The 1Q 2018 Form 10-Q contained the same certification set forth above in Paragraph 241.

250. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 242.

251. The 1Q 2018 Form 10-Q contained the same certification set forth above in Paragraph 243.

252. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 244.

253. The 1Q 2018 Form 10-Q contained the same SOX certification set forth above in Paragraph 245.

254. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 246.

255. The 2Q 2018 Form 10-Q contained the same statement set forth above in Paragraph 239.

256. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 240.

257. The 2Q 2018 Form 10-Q contained the same certification set forth above in Paragraph 241.

258. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 242.

259. The 2Q 2018 Form 10-Q contained the same certification set forth above in Paragraph 243.

260. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 244.

261. The 2Q 2018 Form 10-Q contained the same SOX certification set forth above in Paragraph 245.

262. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 246.

263. The 3Q 2018 Form 10-Q contained the same statement set forth above in

Paragraph 239.

264. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 240.

265. The 3Q 2018 Form 10-Q contained the same certification set forth above in Paragraph 241.

266. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 242.

267. The 3Q 2018 Form 10-Q contained the same certification set forth above in Paragraph 243.

268. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 244.

269. The 3Q 2018 Form 10-Q contained the same SOX certification set forth above in Paragraph 245.

270. The foregoing statement was false or misleading when made for the reasons set forth above in Paragraph 246.

### D. Materially False and Misleading Statements Made Directly to Orbis Investments

271. In addition to the above materially false and misleading statements that were made by Defendants to the investing public at large (including Orbis), materially false and misleading statements were also made directly to Orbis Investments during telephone calls and meetings.

272. Orbis Investments' direct communications with Defendants began even before Silver Run's initial public offering. On March 20, 2017, Orbis Investments had a conference call with Defendants Hackett and Lapeyre, during which Hackett and Lapeyre pitched the Silver Run IPO to Orbis Investments (the "March 20, 2017 Conference Call"). During the March 20, 2017

Conference Call, Defendants told Orbis Investments that Silver Run would seek to create value from any combined company by identifying technical uplifts but not paying for them. Defendants emphasized that if Silver Run could not find a merger target that made sense, they would be fully willing to redeem Silver Run investors and move on to their next fund opportunity.

273. During the March 20, 2017 Conference Call, Defendant Hackett also explained that his work at Riverstone had given him greater knowledge of oil basins than he had obtained as Chairman of Anadarko. Defendant Hackett did not directly answer whether he was personally investing in Silver Run, but stated that no amount of money could motivate him to damage his reputation.

274. During the March 20, 2017 Conference Call, Defendant Lapeyre explained that the SPAC structure enabled Riverstone to increase the size and scale of a particular investment, while still abiding by its investment constraints. Riverstone explained to Orbis Investments that its machine would help drive deal flow and that it had 50 people working on behalf of Silver Run.

275. The statements of Defendants Hackett and Lapeyre during the March 20, 2017 Conference Call about Riverstone's involvement in the current and future Silver Run/Alta Mesa business were material to Orbis Investments' decision to invest in Silver Run. Orbis Investments had previously invested successfully in another Riverstone-controlled SPAC and considered the presence of Riverstone in Silver Run as critical in making its investment decisions with respect to Silver Run. In other words, had Riverstone not been involved with Silver Run, Orbis Investments would not have invested in the project.

276. On August 3, 2017, Orbis Investments personnel spoke via telephone with Defendants Chapelle, Ellis, and Hackett about Orbis Investments potentially participating in a PIPE (private investment in public equity) transaction in connection with Silver Run's merger with

Alta Mesa and Kingfisher (the "August 3, 2017 Conference Call").

277. During this conversation, Orbis Investments specifically asked Chapelle, Ellis, and Hackett about the quality of the acreage in Eastern Kingfisher County due to poor results from adjacent operators. Chapelle, Ellis, and Hackett assured Orbis Investments that the poor results from competitors were due to those companies' poor drilling operations, rather than quality issues with the Eastern Kingfisher field itself.

278. The foregoing statement was false or misleading when made, for among other reasons, because (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores, Alta Mesa's drilling operations limited the amount of oil it could recover from its wells.

279. During the August 3, 2017 Conference Call, Chapelle, Ellis, and Hackett also assured Orbis Investments that its predictions of 600 MBOE EUR were made based on reliable type curves and that recent drilling results had improved over earlier efforts. Chapelle, Ellis, and Hackett also represented that Alta Mesa would be able to offset drilling costs with drilling efficiencies.

280. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the 600 MBOE per well production rate was not capable of being

achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

281. As to Kingfisher, Chapelle, Ellis, and Hackett told Orbis Investments during the August 3, 2017 Conference Call that customers in the STACK would be ramping production volumes and that Kingfisher could be spun-off as a separate, publicly traded master limited partnership by the fourth quarter of 2019.

282. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Chapelle, Ellis, and Hackett knew that Alta Mesa could not produce the advertised amount of oil; and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

283. On October 24, 2017, Orbis Investments met in San Francisco at the office of Orbis Investments with Chapelle, Hackett, Michael McCabe (Alta Mesa's CFO), Tim Turner (Alta Mesa's VP of Corporate Planning), Kevin Bourque (Alta Mesa's VP of Midcontinental Operations), and Michael Christopher (CFO of ARM Energy) (these individuals, collectively, the "October 24 Alta Mesa Meeting Participants," and the meeting, the "October 24, 2017 Meeting").

284. During this meeting, the October 24 Alta Mesa Meeting Participants told Orbis Investments that Alta Mesa's oil type curves were based on drilling 12 wells per section, that there was no drilling interference from drilling north-south wells, and that Alta Mesa expected to hit 100 MBOE/day of production in 2021.

285. The foregoing statements were false or misleading when made, for among other

reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the 100 MBOE/day production rate estimate was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

286. On November 14, 2017, Orbis Investments met in Houston, at Alta Mesa's offices, with Chapelle, Hackett, McCabe and Turner (the "November 14, 2017 Meeting").

287. During this meeting, Chapelle, Hackett, McCabe and Turner told Orbis Investments that while there was production variability after its STACK wells are drilling and begin producing oil, this variability did not affect the overall EUR of the wells and that the consistency of oil EUR was very high.

288. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the full EUR of Alta Mesa's wells was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

289. During the November 14, 2017 Meeting, Chapelle, Hackett, McCabe and Turner also assured Orbis Investments that all 1,500 foot spaced child wells would have production about equal to the parent well.

290. The foregoing statement was false or misleading when made, for among other

reasons, because it did not disclose that Chapelle, Hackett, McCabe and Turner knew that child wells would not achieve the same production levels as parent wells.

291. Also during the November 14, 2017 Meeting, Chapelle, Hackett, McCabe and Turner stated that parents wells would cost approximately $4 million each to drill, and that child wells would cost approximately $3.5 million each to drill.

292. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that Alta Mesa could only achieve these drilling costs by using improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life.

293. On March 29, 2018, Alta Mesa disclosed EBITDA and production results that were dramatically less than the estimates provided in the Proxy. That disclosure revealed that Alta Mesa's average net daily production was 8% below the 2018 estimates provided in the Proxy and that Kingfisher's 2018 EBITDA was expected to be about half of what was estimated in the Proxy. Following these disclosures, Alta Mesa's stock dropped in value by about 4.5% from a closing price on March 28, 2018 of $8.38 per share to a closing price on March 29, 2018 of $8.00 per share.

294. The next week, on April 3, 2018, Orbis Investments had a conference call with Alta Mesa management, including Defendant Chapelle (the "April 3, 2018 Conference Call"). During this call, Defendant Chapelle engaged in false and misleading damage control. He told Orbis Investments that the issues with Alta Mesa's performance would solely have timing impacts, including that upstream performance was experiencing some lag but was nonetheless pretty consistent. Defendant Chapelle also added that $350 million in EBITDA was not off the table, but

that the timing was merely pushed.

295. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; (ii) the full EUR of Alta Mesa's wells was not capable of being achieved (regardless of timing), including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores; (iii) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; and (iv) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher.

296. During the April 3, 2018 Conference Call, Defendant Chapelle also admitted that drilling costs were one of the headwinds that Alta Mesa was facing.

297. The foregoing statement was false or misleading when made, for among other reasons, because although Defendant Chapelle disclosed that Alta Mesa was facing cost headwinds, he did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the full EUR of Alta Mesa's wells was not capable of being achieved (regardless of drilling costs), including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

298. During the April 3, 2018 Conference Call, Defendant Chapelle explained to Orbis

Investments that Alta Mesa's 2018 production would likely be slightly lower than the company's 33 to 38 MBOE per day guide, because of the delay that had affected first quarter production. In response to Orbis Investments' question about Alta Mesa's long-term production plateau, Defendant Chapelle answered that the plateau would be 60 to 70 MBOE per day by 2019.

299. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the full EUR of Alta Mesa's wells was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

300. During the April 3, 2018 Conference Call, in response to a question from Orbis Investments about well costs using pad drilling, Defendant Chapelle confirmed that a per-well cost of $3.8 million was easy to achieve on average.

301. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the full EUR of Alta Mesa's wells was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

302. After Alta Mesa released its first quarter 2018 earnings, on May 16, 2018, Orbis Investments had a conference call with Alta Mesa management, including Defendants Chapelle

and Hackett (the "May 16, 2018 Conference Call"). During this call, Defendant Chapelle continued to make false and misleading statements to engage in damage control, including stating that Alta Mesa was comfortable with its 2018 upstream guidance, that it would increase production by 17% per quarter in 2018 on a net basis, and that it would achieve those levels by increasing efficiency and utilizing multi-well pads.

303. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the full EUR of Alta Mesa's wells was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

304. After Alta Mesa released its second quarter 2018 earnings, on August 14, 2018, Orbis Investments had a conference call with Scott Grandt, a member of Alta Mesa's Investor Relations team. During the call, Orbis understood Grandt to be communicating on behalf of Alta Mesa management, including Defendants Chapelle and Hackett, who had both participated in the earnings call that occurred earlier the same day, and who, on information and belief, both had ultimate authority and control over Grandt's statements to Orbis Investments.

305. During the August 14, 2018 Conference Call, Grandt explained that Alta Mesa had been optimizing its fracking process.

306. The foregoing statement was false or misleading when made, for among other reasons, because it did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same

time eliminating about a third of the well's revenue generating capabilities over the course of its life; and (ii) the full EUR of Alta Mesa's wells was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores.

307. As to Kingfisher, during the August 14, 2018 Conference Call, Grandt disclosed that Alta Mesa did not see third-party customers of Kingfisher ramping as fast as expected, and that third-party business development had not transpired as Alta Mesa had predicted. Grandt explained that at least three to four third-party customers were shifted to 2019, but that Alta Mesa expected that those customers would eventually come. Grandt added that Kingfisher would benefit from Alta Mesa ramping production.

308. The foregoing statements were false and misleading when made, for among other reasons, because they did not disclose that (i) Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements; (ii) Defendants knew that Alta Mesa could not produce the advertised amount of oil (and thus would not be able to ramp production as disclosed); and (iii) beginning in 2017, Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher, and thus the 2018 third-party underperformance was nothing new.

309. On August 29, 2018, Orbis Investments visited Alta Mesa in Houston and met with Alta Mesa management, including Defendant Chapelle and McCabe (the "August 29, 2018 Meeting"). As CEO, Defendant Chapelle had ultimate authority over the content of the information that Alta Mesa management presented to Orbis Investments. During the meeting, Chapelle explained that Alta Mesa's performance was a disappointment, particularly its Kingfisher

midstream business, and that management was gradually making changes to reverse course, and that the Alta Mesa Board was laser-focused on improving management leadership.

310. The foregoing statements were misleading because they did not reveal to Orbis Investments the true nature and extent of Alta Mesa's production or midstream problems, nor that Defendants had actively misled the investing public, including Orbis Investments, about those topics, including failing to disclose, among other things, that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; (ii) the full EUR of Alta Mesa's wells was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad, as well as the limitations imposed by the improperly drilled bores; and (iii) beginning in 2017, Kingfisher knew that other third party customers had delayed drilling on acreage served by Kingfisher.

311. On August 30, 2018, Orbis Investments spoke with Defendant Hackett about similar issues as were discussed a day earlier during the Houston meeting (the "August 30, 2018 Conference Call"). In particular, Orbis Investments further emphasized that its investment in Alta Mesa was due in part to Defendant Hackett's role as Executive Chairman and to Riverstone's involvement in Alta Mesa.

312. After Alta Mesa released its third quarter 2018 earnings, on November 13, 2018, Orbis Investments had a conference call with Alta Mesa management (the "November 13, 2018 Conference Call"). During this call, Defendants Chapelle and Hackett insisted to Orbis Investments that Alta Mesa's model works, and that the company's performance could be turned around by drilling in fewer, higher confidence locations. Defendants Chapelle and Hackett stated

that Alta Mesa would recover as much per well, but would simply be drilling fewer wells. Although Defendants Chapelle and Hackett did not admit the full truth of the myriad false and misleading statements detailed above, they stated that the production from child wells was not as good as from parent wells, and that Alta Mesa's objective was to improve child well performance. As to Kingfisher, Defendants Chapelle and Hackett stated that lowered EBITDA estimates were partly a result of less activity than expected from Chisholm Oil & Gas, a driller in the STACK.

313. The foregoing statements were false or misleading when made, for among other reasons, because they did not disclose that (i) nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life; (ii) the full EUR of Alta Mesa's wells was not capable of being achieved, including because of erroneous assumptions for optimal well-spacing and number of wells per pad (which was known to Defendants more than one year before the November 13, 2018 Conference Call), as well as the limitations imposed by the improperly drilled bores; and (iii) beginning in 2017 (more than one year before the November 13, 2018 Conference Call), Kingfisher knew that the other "third party customers" had delayed drilling on acreage served by Kingfisher, and thus the decreased activity by Chisholm in the third quarter of 2018 was not a new phenomenon, and should not have been described as such.

314. On December 20, 2018, Orbis Investments attended Alta Mesa's Board of Directors meeting, which included Defendant Hackett, as well as Brandt (the "December 20, 2018 Meeting"). In addition to disclosing that Riverstone had completed a deep dive technical review into Alta Mesa's business and operations, the results of which would be revealed in January 2019, Alta Mesa (through Brandt) conceded that certain technical data had been received in the prior

three months that cast doubt on Alta Mesa's drilling strategies and that the Company had to acknowledge that its wells had not performed as promised to the investing public, including Orbis Investments. But Alta Mesa did not reveal the full truth about the myriad false and misleading material statements detailed herein. This failure itself constituted a material misstatement or omission to Orbis Investments.

### E. This Court's Decision Denying the Motion to Dismiss the Class Action Complaint Confirms Defendants' Numerous Materially False and Misleading Statements

315. This Court has already held that many of the above statements are adequately alleged to have been materially false and misleading when made.

316. Indeed, the Court held that the "circumstances surrounding [Alta Mesa's] financial reporting . . . are alone enough" to proceed to discovery. (No. 19-cv-957, ECF No. 160 at 25.)

## VI. SUMMARY OF DEFENDANTS' SCIENTER

317. In denying the motion to dismiss the Class Action Complaint, the Court held that severe recklessness, sufficient to plead scienter under Section 10(b), was shown based on allegations that (i) the $3.1 billion February 2019 write-down "constituted over 80% of Alta Mesa's value and was disclosed a year after the special purpose acquisition company merger"; (ii) "[t]he write-down came simultaneously with the news that Alta Mesa's accounting firm identified sixteen 'material weaknesses' in Alta Mesa's internal control over financial reporting," including (a) "ineffective controls over the identification and processing of relevant and reliable information," (b) "ineffective controls over the financial statement close and disclosure process, including the completeness, existence and accuracy of the financial information," and (c) "ineffective management review controls over various complex accounting estimates"; (iii) "[t]he SEC is investigating the write-down and Alta Mesa's accounting practices"; and (iv) the Class Action Complaint including "accounts of two production engineers" that "AMH and Alta

Mesa clandestinely used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates both before and after the merger." (No. 19-cv-957, ECF No. 160, at 27-28.)

318. The strong inference of scienter based on the foregoing allegations is further heightened given that Defendants made materially false and misleading statements directly to Orbis Investments in direct communications, including during telephone calls and in-person meetings. These misstatements were made in response to specific questions asked by Orbis Investments about the material topics discussed above, including (a) statements concerning AMH/Alta Mesa oil production and drilling methods; and (b) statements concerning Kingfisher's prospects and expected revenue. Moreover, that these material misstatements were made directly to Orbis Investments by certain of the Defendants during one-on-one communications (including in person) confirms that the material misstatements were made intentionally, or, at a minimum, with reckless disregard for their truth, rather than being the result of a careless mistake based on false information provided to Defendants by lower-level employees.

319. In addition, the strong inference of scienter is further heightened by Defendants' false and misleading statements in direct communications to Orbis Investments because at all relevant times, Alta Mesa, and the public, knew that Plaintiffs were significant shareholders of Silver Run and/or Alta Mesa. On information and belief, had Plaintiffs disposed entirely of their holdings of Silver Run and/or Alta Mesa, this fact, when publicly disclosed, would have caused the price of Silver Run and/or Alta Mesa stock to decrease. Thus, Defendants were particularly motivated to mislead Orbis Investments in order to prevent this result.

320. **Additional Scienter for Statements About Kingfisher**. Kingfisher was founded to serve as AMH's midstream gatherer in the STACK. Kingfisher was funded through investments by ARM, HMI, and HPS. Chappelle and Ellis owned a large stake in Kingfisher.

321. Presentations about the creation of Kingfisher detailed that the rates it would charge to AMH would be substantially higher than the then-current rates AMH was paying for gathering services in the STACK.

322. The 2015 Gathering Agreements between Kingfisher and AMH favored Kingfisher and were unfair to AMH. Chappelle signed those agreements on behalf of both AMH and Kingfisher.

323. AMH managers openly questioned the exorbitant fees that AMH was paying Kingfisher under the 2015 Gathering Agreements.

324. Under the terms of a December 1, 2016 agreement, Kingfisher was required to construct a system to gather up to 50,000 barrels of oil per day from AMH. Kingfisher never constructed this system, but still charged AMH for every barrel that AMH paid another party to transport.

325. Thus, the value of AMH's production assets were being diverted to Kingfisher, and its owners, including ARM, HMI, HPS, Chappelle, and Ellis.

326. **Additional Scienter for Statements About AMH/Alta Mesa's Oil Production and Drilling Methods**. As early as June 2017, Chappelle, Turner, and Ellis knew that patterns that had six or more wells in a section would produce less than patterns that had three wells or fewer per section. Turner told Chappelle in June 2017 that there "could be an argument" that the test patterns with an EUR of around 250 MBO achieved those results because those patterns only had three wells per section. Chappelle agreed with this assessment.

327. In June 2017, Chappelle also told Ellis that a test pattern that would be drilled later in 2017 would be a "very important test," as it would be an eight-well child pattern, as opposed to a three-well sibling pattern, like the patterns that had EUR of around 250 MBO.

328. By August 2017, Chappelle, Ellis, and Turner knew that none of the child wells in the test patterns that were producing oil at that time had anywhere close to an EUR of 250 MBO.

329. By November 2017, Chappelle, Ellis, and Turner also knew that drilling more wells in a section could cause well interference, lowering the production from certain wells in that section. These concerns arose in connection with one of the test patterns that had an EUR of only about 150 MBO.

330. As of December 2017, only two test patterns had an average EUR per well of around 250 MBO, and both of those were sibling patterns. These two test patterns only had three wells per pattern. Thus, the results of these two patterns could not be reliably extrapolated to drilling patterns with more wells per section.

331. Alta Mesa's 2018 drilling program was predicated on the premise that Alta Mesa had more than 4,000 gross drilling locations, could drill up to 12 wells per section, and could recover 250 MBO from each well in the section. But Alta Mesa, Chappelle, Ellis, and Turner knew as early as mid-2017 that those recoveries could not be achieved.

332. Moreover, Alta Mesa's drilling program was essential to Alta Mesa's success and was therefore a core operation of the Company. Alta Mesa's directors and officers knew, or were reckless in being unaware of, the details of Alta Mesa's STACK drilling strategy. In particular, Defendants' communications with the investing public were focused on Alta Mesa's STACK drilling program, reflecting that Alta Mesa, the Management Defendants, and the Board Defendants were privy to specific knowledge (or direct access to) data and facts regarding Alta Mesa's STACK drilling, whether the true facts were disclosed to the investing public or not.

333. For example, on August 11, 2016, Defendant Chappelle participated in an earnings conference call with analysts and investors, which made clear that he was focused on the details

of AMH's STACK drilling strategy. Defendant Chappelle remarked: "We're drilling and completing our STACK wells for about $3.1 million per well, having cut our drilling time from over 30 days in 2014 to an average of less than 15 days, spud to rig release is the measure during the past few years. Much of the decrease in our average well cost since 2014 has come from design and efficiency improvements. We're focused on the continued definition of a large-scale program of horizontal drilling and multistage hydraulic fracturing to develop the Mississippian age section within our acreage, which is primarily Osage and Meramec. It also includes Manning and Chester in a material part of our footprint. In addition to this, we're also developing the Pennsylvanian age Oswego line, as well as other formations."

334. Defendant Chappelle made similarly detailed statements about the STACK drilling strategy and operations on conference calls with analysts and investors on November 10, 2016, and March 30, 2017.

335. According to allegations in the Class Action Complaint based on information obtained from a former Alta Mesa employee, the Company conducted meetings on Monday mornings (the "Monday Morning Meetings"), which were attended by mid-to-senior management from the (i) drilling/engineering; (ii) completions; (iii) production; and (iv) facilities groups. Defendants Chappelle, Ellis, and Hackett regularly attended the Monday Meetings. The topics covered during the Monday Meetings included actual and projected production data from Alta Mesa's STACK wells, as well as technical and detailed topics about well production, such as the use of ESPs, water handling, and other topics.

336. The Class Action Complaint further alleges that a senior reservoir engineer at Alta Mesa initially provided management with internal EUR estimates, but, unhappy with those estimates, Alta Mesa management pressured that engineer to provide higher EUR estimates. After

the engineer refused to do so, management removed them from the task of generating EUR estimates and reduced their job responsibilities.

337. In addition to drilling too many wells per pad and drilling wells too close together, which Alta Mesa management knew would damage the long-term production prospects from those wells, Alta Mesa also employed ESPs to increase production. But ESPs were costly, leading to an increased per-pump cost of approximately $400,000 to $415,000, along with electricity costs. Moreover, although ESPs were used in drilling operations in other regions, such as the Gulf Coast, ESPs were not appropriate for the drilling conditions present in the STACK, leading the ESPs to clog frequently, which required costly remediation. This further drove up per-pump costs.

338. Worse still, any increased production from employing ESPs was only a short-term phenomenon, as the increased production on the wells with ESPs were essentially robbing other wells of potential production.

339. According to allegations in the Class Action Complaint based on information obtained from a former Alta Mesa employee, Alta Mesa's senior management, including the Management Defendants, were told during Monday Meetings that the use of ESPs was not prudent in the long-term and that ESPs were causing adjacent wells to produce less oil than previously. Indeed, other companies in the STACK region has also tried using ESPs but had abandoned that practice because overall production was not improved.

340. In addition, in an attempt to increase production, Alta Mesa drilled highly curved bore holes. According to allegations in the Class Action Complaint based on information obtained from a former Alta Mesa employee, Alta Mesa's senior management, including the Management Defendants, were told during Monday Meetings by production personnel about how Alta Mesa had drilled the wellbores in violation of industry norms in a manner that would jeopardize the

long-term viability of the well.

341. Also according to the Class Action Complaint, industry practice involves moving the drilling rig a reasonable distance on the pad when drilling on a new well commences. But to save money, Alta Mesa did not sufficiently move the rigs across the pad, but rather "walked" them a short distance to the new drilling location. To avoid contact between these wellbores, many of Alta Mesa's wells had the upper vertical portions of their bores drilled in an unusual "S"-shape. This "S" shape undermined the child wells' extraction potential at the later stage of its production. This was not normal industry practice. The consequence of the S-shaped wells was that Alta Mesa was knowingly sacrificing one-quarter to one-third of the lifetime output of over 90% of its wells. Despite repeated complaints to Alta Mesa's senior management, including the Management Defendants, the Company stuck to this short-sighted practice. As a result, the Defendants knew the Company's 650 MBOE/d reserve estimates were wildly and knowingly exaggerated.

342. The Class Action Complaint alleges that Defendant Ellis stated during an internal meeting that an unspecified, nonexistent technology in the future would become available to address the long-term problems caused by an S-shaped well. Ellis was informed that no such technology existed, and that companies were not even investing in research and development for such technology at this time.

343. **The SPAC Structure Further Supports a Strong Inference of Scienter Here.** In November 2016, Silver Run obtained 11,500,000 founder shares of Alta Mesa for $25,000, or approximately $0.002 per share. In March 2017, Silver Run Sponsor II, LLC ("Sponsor") (an affiliate of Defendant Riverstone), obtained an additional 14,375,000 founder shares as a result of a stock dividend. At the same time, the Sponsor transferred a total of 99,000 founder shares to the Company's independent board members.

344. Accordingly, as of March 2017, Riverstone controlled 25,875,000 founder shares, with a cost basis of $25,000 (or $0.00096 per share). Moreover, in March 2017, the Sponsor transferred 33,000 founder shares each to Gutermuth, Tepper and Walters, at a cost basis of $0.00.

345. According to the Company's regulatory filings, each founder share is the equivalent of one share of Alta Mesa's Class A common stock. These founder shares would automatically convert into common stock at the time of a business combination of Silver Run. But if Silver Run did not complete a business combination, the shares would be worthless.

346. At the time of Silver Run's IPO, all members of its management team were employed by Riverstone, and its Board was closely affiliated with and controlled by Riverstone. Specifically, at the time of the IPO, (i) Defendant Hackett, Silver Run's CEO and Chairman of the Board, was a Partner at Riverstone and co-head of its Houston office; (ii) Silver Run's CFO, Defendant Walker, was a Partner at Riverstone and served as its CFO; and (iii) Stephen S. Coats, the Corporate Secretary of Silver Run, was a Riverstone Partner and served as its General Counsel. In addition, Riverstone founders Defendants Leuschen and Lapeyre later became directors of Alta Mesa.

347. In the Silver Run IPO prospectus, Riverstone detailed its extensive process of evaluating business targets, which included "meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience."

348. Pursuant to its IPO prospectus, Silver Run was required to enter into a transaction with a target business having an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds.

349. This requirement created significant pressure on Silver Run, which was controlled and managed by Defendant Riverstone, to quickly find, obtain approval for, and close a transaction. In the event Silver Run did not complete an initial business combination within the required time period, it was obligated to redeem 100% of its outstanding public shares and Riverstone's holdings in Silver Run would be worthless. Shareholders also had the right to redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.

350. According to the Proxy (which was signed by Defendant Hackett and issued by order of the Board), negotiations regarding the Merger between Silver Run, AMH, and Kingfisher had been ongoing since at least March 2017 – shortly after the Silver Run IPO – and involved the consideration of "multiple alternative target opportunities." Given the extended duration of these negotiations, and the fact that Riverstone purportedly found all alternatives to be unsuitable for an initial business combination, Riverstone was unlikely to complete another business combination within the requisite two-year time period if Silver Run shareholders did not vote to approve the Merger. Thus, the Merger was Riverstone's last chance to profit from its Silver Run investment.

351. On February 9, 2018, all founder shares were converted to shares of Alta Mesa Class A common stock on a one-for-one basis.

352. In February 2018, the Company began the process of offering Alta Mesa securities in a secondary offering. As part of the offering, Riverstone, Hackett, Gutermuth, Tepper and Walters, through the Sponsor, had the opportunity to sell all of their founder shares provided certain sales restrictions were met. Namely, they could sell their founder shares if and when the sale price of the Company's Class A common stock exceeded $12.00 per share for any 20 trading days within any 30-day trading period commencing at least 150 days after the closing date of the

Silver Run, AMH and Kingfisher merger (alternatively, 150 days following February 9, 2018).

353. Riverstone, Hackett, Gutermuth, Tepper and Walters, therefore, had the motivation to mislead (as well as cause others to mislead) about the potential of Alta Mesa, the STACK drilling strategy, and Kingfisher. Had Alta Mesa's stock price met the founder stock sale restriction – hypothetically traded at just $12.01 per share for 20 days within a 30-day trading period – and they sold that stock for $12.01 per share, Riverstone, Hackett, Gutermuth, Tepper and Walters had the opportunity to unlawfully profit by over $301 million on investments that carried a mere cost basis of $25,000.

354. Riverstone was also involved in the strategic and day-to-day operations of Alta Mesa, even prior to the Merger. After the Silver Run IPO, Riverstone explained to Orbis Investments that its machine would help drive deal flow and that it had 50 people working on behalf of Silver Run. In mid-2017, Riverstone hired three consultants, including John Campbell and Mark Castillani, to assist AMH with technical matters. Testimony during the Sales Hearing in Alta Mesa's Bankruptcy Proceedings showed that Riverstone and its consultants were involved in designing and analyzing AMH's 2018 drilling program. In late 2018, with Alta Mesa experiencing operational troubles, Riverstone conducted a deep-dive technical review to guide a turnaround or reinvestment strategy at Alta Mesa. Defendant Hackett told Orbis Investments that Riverstone could again bring in its consultants to assist with that plan.

355. Control Entity Defendants Bayou City and HPS were also incentivized to mislead investors. *First*, these defendants received part of the $1.3 billion paid to the prior owners of AMH and Kingfisher through the Merger. Specifically, Bayou City and HPS, along with non-party High Mesa, received $814.8 million in cash from the merger, as well as approximately a 14.4% economic interest in an operating company that was Alta Mesa's sole significant asset following

the merger.

356. *Second*, in order to inflate Alta Mesa's stock price following the transaction to receive the earn-out payments worth up to $1 billion if Alta Mesa's 20-day value-weighted average price exceeded various thresholds ranging from $14.00 per share to $20.00 per share.

357. Defendant Bayou City also maintained and exerted significant control over Alta Mesa both prior to and after the Merger. Bayou City entered into a development agreement with AMH before the Merger that provided Bayou City with partial control over AMH's drilling strategy and an economic interest in up to eighty AMH wells. After the Merger, Bayou City, along with HPS, owned a substantial economic interest in the operating company that owned AMH and Kingfisher. Bayou City and AMH also held significant voting rights in Alta Mesa following the Merger.

358. Even after Alta Mesa filed for bankruptcy in September 2019, representatives of the Control Entity Defendants attended the Company's board meetings. For instance, at a Kingfisher Midstream, LLC board meeting on September 3, 2019, not only were the Control Entity Defendants represented by Defendants McMullen, Dimitrievich, Lapeyre and Leuschen, but the following additional representatives of the Control Entity Defendants were in attendance: Steve Coats (Riverstone), Rajen Mahagaokar (Riverstone), Robert Tichio (Riverstone), Dan Wallit (HPS) and Mark Stoner (Bayou).

359. During the bankruptcy proceedings, BCE-Mach III, a partnership between Defendant Bayou City and Mach Resources LLC, an Oklahoma-based oil and gas exploration company, purchased substantially all of Alta Mesa's upstream and midstream assets for approximately $320 million. Following the acquisition, Defendant McMullen, founder of Defendant Bayou City, stated that "We know these particular assets well and are confident that the

Mach team will be able to operate them in a manner suitable to the current macro environment, focused on maximizing free cash flow generation and delivering a sustainable, conservatively leveraged return to our investors."

## VII. PRESUMPTION OF RELIANCE

360. Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Silver Run/Alta Mesa's common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Silver Run/Alta Mesa's common stock; and (e) Plaintiffs purchased Silver Run/Alta Mesa's common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

361. The market for Silver Run/Alta Mesa's common stock was open, well-developed and efficient at all relevant times. As a result of the aforementioned materially false and misleading statements, Silver Run/Alta Mesa's common stock traded at artificially inflated prices during the relevant period. The artificial inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations concerning (i) AMH/Alta Mesa oil production and drilling methods; (ii) Kingfisher's prospects and expected revenue; and (iii) Alta Mesa's internal controls.

362. At all relevant times, the market for Silver Run/Alta Mesa's common stock was efficient for the following reasons, among others: (a) Silver Run/Alta Mesa filed periodic reports with the SEC; (b) Silver Run/Alta Mesa's common stock met the requirements for listing and was

in fact listed and actively traded on the NASDAQ, a highly efficient and automated market, during the time that Plaintiffs purchased Silver Run/Alta Mesa's common stock; (c) numerous securities analysts that were employed by major brokerage firms followed Alta Mesa, preparing reports that were distributed to the sales forces and customers of their respective brokerage firms, with such reports being publicly available and entering the public marketplace; and (d) Silver Run/Alta Mesa regularly publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

363. In the Class Action, Defendants did not oppose class certification, thereby effectively conceding that Silver Run/Alta Mesa common stock traded in an efficient market during the period when Plaintiffs purchased that stock in reliance on its market price. (*See* No. 19-cv-957, ECF No. 240.)

364. Plaintiffs relied on the market price of Silver Run/Alta Mesa's common stock, which reflected all the information in the market, including the misstatements by Defendants.

## VIII. PLAINTIFFS' ACTUAL RELIANCE

365. During the relevant period, Plaintiffs' investment in Silver Run/Alta Mesa common stock was managed by Orbis Investments. Investment personnel at Orbis Investments initiated the investment decisions with respect to Plaintiffs' purchases and holding of Alta Mesa common stock. Factors considered by Orbis Investments personnel in making such decisions included, among other things, Alta Mesa's financial performance and a review of the Company's strengths, weaknesses and opportunities.

366. In addition, Orbis Investments had direct communications with Defendants about

investing in Silver Run/Alta Mesa and Alta Mesa's operations. Specifically, Orbis Investments spoke telephonically or met with Defendants and/or Alta Mesa personnel on March 20, 2017, August 3, 2017, October 24, 2017, November 14, 2017, April 3, 2018, May 16, 2018, August 14, 2018, August 29, 2018, August 30, 2018, November 13, 2018, and December 20, 2018. Orbis Investments considered the information told to it by Defendants and/or the Alta Mesa personnel who participated in these meetings and conference calls (*i.e.*, the March 20, 2017 Conference Call, the August 3, 2017 Conference Call, the October 24, 2017 Meeting, the November 14, 2017 Meeting, the April 3, 2018 Conference Call, the May 16, 2018 Conference Call, the August 14, 2018 Conference Call, the August 29, 2018 Meeting, the August 30, 2018 Conference Call, the November 13, 2018 Conference Call, and the December 20, 2018 Meeting) in making its investment decisions to purchase and/or hold Silver Run and Alta Mesa common stock.

367. Prior to making the decision to purchase Silver Run/Alta Mesa common stock and in making the continued decision to hold (*i.e.* refrain from selling) Silver Run/Alta Mesa common stock, an Orbis Investments professional actually and justifiably read, reviewed and relied upon (to the extent the referenced documents had been published at the time) information contained in the August 16, 2017 8-K, the August 17, 2017 Conference Call, the Proxy, the March 29, 2018 Press Release, the March 29, 2018 Presentation, the March 29, 2018 Conference Call, the 2017 Form 10-K, the May 14, 2018 Presentation, the May 14, 2018 Conference Call, the 1Q 2018 Form 10-Q, the Second Quarter 2018 Update Presentation, the 2Q 2018 Form 10-Q, August 20, 2018 Presentation, and the 3Q 2018 Form 10-Q, including (as applicable): (a) the statements concerning AMH/Alta Mesa oil production and drilling methods; (b) the statements concerning Kingfisher's prospects and expected revenue; and (c) the statements concerning Alta Mesa's internal controls.

368. Orbis Investments personnel actually and justifiably relied upon information

contained in the foregoing documents (to the extent each such document had been published at the time) in making each purchase of Silver Run/Alta Mesa common stock alleged herein on behalf of Plaintiffs. Orbis Investments personnel also actually and justifiably relied upon information contained in the foregoing documents (to the extent each such document had been published at the time) in choosing to hold its Alta Mesa common stock and to refrain from selling that common stock.

369. In addition, prior to making the decision to purchase Silver Run/Alta Mesa common stock and in making the continued decision to hold (*i.e.* refrain from selling) Silver Run/Alta Mesa common stock, Orbis Investments actually and justifiably relied on the statements made by Defendants and/or Alta Mesa personnel during the March 20, 2017 Conference Call, the August 3, 2017 Conference Call, the October 24, 2017 Meeting, the November 14, 2017 Meeting, the April 3, 2018 Conference Call, the May 16, 2018 Conference Call, the August 14, 2018 Conference Call, the August 29, 2018 Meeting, the August 30, 2018 Conference Call, the November 13, 2018 Conference Call, and the December 20, 2018 Meeting including: (a) the statements concerning AMH/Alta Mesa oil production and drilling methods; and (b) the statements concerning Kingfisher's prospects and expected revenue.

370. In addition, Orbis Investments personnel actually and justifiably relied upon information contained in, or communicated during, the August 16, 2017 8-K, the August 17, 2017 Conference Call, and the Proxy in voting on the Merger. Orbis Investments also actually and justifiably relied upon information conveyed to it by Defendants and/or Alta Mesa personnel during the March 20, 2017 Conference Call, the August 3, 2017 Conference Call, October 24, 2017 Meeting, and November 14, 2017 Meeting meeting in voting on the Merger. Had Orbis Investments personnel knew the true facts about (a) AMH/Alta Mesa oil production and drilling

methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls that were known to Defendants at the time of the vote on the Merger, but withheld from Orbis and the investing public, Orbis Investments personnel would have chosen to redeem Orbis' Silver Run shares rather than hold those shares through the Merger. By relying on Defendants' materially false and misleading statements about the foregoing topics, Orbis Investments personnel were induced into not selling on the market or redeeming Orbis' Silver Run shares and instead holding those shares through the Merger.

371. Orbis Investments also actually and justifiably relied upon the involvement of Riverstone and its control of Silver Run and Alta Mesa in deciding to purchase Silver Run and Alta Mesa shares, as well as choosing to hold those shares, and, prior to the IPO, not selling on the market or redeeming Silver Run shares and instead holding those shares through the Merger. During the March 20, 2017 Conference Call, Defendants Hackett and Lapeyre made clear to Orbis Investments the extent of Riverstone's involvement with Silver Run, including the knowledge of oil basins that Hackett had gotten while working at Riverstone and the extensive resources that Riverstone was devoting to identifying a suitable merger target for Silver Run. Moreover, Orbis Investments had previously invested in another SPAC sponsored by Riverstone and based on that experience, had invested and held its investment in Silver Run and Alta Mesa because of Riverstone's involvement and control. This fact was known to Riverstone and Defendant Hackett. Indeed, on August 30, 2018, Orbis Investments reiterated to Defendant Hackett that Orbis Investments had made its investment decisions in Silver Run and Alta Mesa because of Riverstone's involvement.

## IX. LOSS CAUSATION

372. As the truth about AMH/Alta Mesa oil production and drilling methods,

Kingfisher's prospects and expected revenue, Alta Mesa's internal controls gradually and slowly leaked into the market, and the risks that Alta Mesa and Defendants had concealed materialized, starting on March 29, 2018, the price of Alta Mesa's common stock dropped precipitously.

373. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs. During the time that Plaintiffs purchased Alta Mesa's common stock, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements. Specifically, statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls, caused the price of Alta Mesa's common stock to be artificially inflated.

374. As a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements with respect to (a) the statements concerning AMH/Alta Mesa oil production and drilling methods; (b) the statements concerning Kingfisher's prospects and expected revenue, and (c) the statements concerning Alta Mesa's internal controls – and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized – the price of Alta Mesa's stock declined precipitously, and Plaintiffs were damaged.

375. Defendants' fraud was first partially revealed on March 29, 2018, when Alta Mesa disclosed EBITDA and production results that were dramatically less than the estimates provided in the Proxy. That disclosure revealed that Alta Mesa's average net daily production was 8% below the 2018 estimates provided in the Proxy and that Kingfisher's 2018 EBITDA was expected to be about half of what was estimated in the Proxy.

376. Following these disclosures, Alta Mesa's stock dropped in value by about 4.5%

from a closing price on March 28, 2018 of $8.38 per share to a closing price on March 29, 2018 of $8.00 per share. This decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements.

377. Alta Mesa's stock price continued to decline the next trading day, April 2, 2018, closing at $7.36 per share, an additional 8% decline from the $8.00 closing price on March 29, 2018. This decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements. In total, Alta Mesa common shares declined by approximately 12% from its closing price on March 29, 2018 through its closing price on April 2, 2018.

378. Defendants' March 29, 2018 disclosures continued their fraud upon public investors, including Orbis. Defendants claimed that the problems with production and Kingfisher's revenues were temporary and continued to make positive statements about Alta Mesa's growth, including reaffirming the 2018 projections contained in the Proxy. Defendant Chappelle represented that the results only represented a six-month shift in revenue for Kingfisher and a two-month shift for AMH's oil production.

379. On August 14, 2018, Alta Mesa disclosed that it expected average net daily production for 2018 to be 22% below the projections contained in the Proxy, and that as of the second quarter of 2018, production was about one-third less than the Proxy projections. Alta Mesa

also revealed that its wells were suffering from technical problems, including repeated shut-ins, that further hampered production. As to Kingfisher, Alta Mesa disclosed that its EBITDA was significantly below the 2018 projections contained in the Proxy.

380. Following these disclosures, Alta Mesa's stock plummeted in value by more than 21% from a closing price on August 13, 2018 of $6.08 per share to a closing price on August 14, 2018 of $4.77 per share. This marked decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements.

381. As the market continued to absorb and react to Alta Mesa's August 14, 2018 disclosures, Alta Mesa stock continued to fall by more than 9%, from a closing price on August 14, 2018 of $4.77 per share to a closing price of $4.34 per share on August 15, 2018. This decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements. In total, Alta Mesa's stock price declined by about 29% from its closing price on August 13, 2018 through its closing price on August 15, 2018.

382. Yet again, Defendants lulled the investing public, including Orbis, with Defendant Chappelle assuring investors that any problems were temporary and mere "timing delays." Defendant Chappelle even went so far as to claim that production problems had no effect on the long-term value of Alta Mesa and that Alta Mesa was "poised to deliver significant shareholder

value." Similarly, despite Kingfisher's anemic 2018 performance to date, Defendant Chappelle promised "continued opportunity for business expansion, given the strong fundamentals of STACK and Northwest STACK."

383. On November 13, 2018, after market close, Alta Mesa disclosed that it would report consolidated EBIDTAX of only $83.8 million, dramatically below the $358 million projection in the Proxy. Alta Mesa also reduced Kingfisher's 2018 EBITDA to only $36 to $38 million, about 80% less than the Proxy's projections less than a year earlier.

384. Following these disclosures, Alta Mesa's stock declined in value by about 15% from a closing price on November 13, 2018 of $2.82 per share to a closing price on November 14, 2018 of $2.40 per share. This marked decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements.

385. As the market continued to absorb and react to Alta Mesa's November 13, 2018 disclosures, Alta Mesa stock continued to fall by about 5%, from a closing price on November 14, 2018 of $2.40 per share to a closing price of $2.285 per share on November 15, 2018. This decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements. In total, Alta Mesa's stock price declined by about 20% from its closing price on November 13, 2018 through its closing price on November 15, 2018.

386. As with the prior disclosures, Defendants continued to conceal the full truth of their fraud from the investing public, including Orbis. Defendant Chappelle reiterated that the "quality" of Alta Mesa's assets and its cost control "allow[ed]" it "to have consistently profitable wells." Alta Mesa also announced the transfer of water disposal assets from AMH to Kingfisher and reiterated that the "long-term outlook" for Kingfisher was "strong."

387. On February 25, 2019, after market close, Alta Mesa disclosed that it would be forced to delay the announcement of its 2018 results because it "had an ineffective internal control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures."

388. Making matters worse, Alta Mesa also disclosed that it expected to "record material, non-cash asset impairment charges" of approximately $3.1 billion—nearly the entire value of the Merger—representing $2 billion from AMH and $1.1 billion from Kingfisher. And Alta Mesa projected that 2019 production would be less than half of the 2019 production estimates contained in the Proxy and that the Company would reduce its active drilling rig count to zero (from six) by the end of January 2019.

389. Following these disclosures, Alta Mesa's stock cratered in value by about 63% from a closing price on February 25, 2019 of 91 cents per share to a closing price on February 26, 2018 of 24 cents per share. This marked decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements.

390. As the market continued to absorb and react to Alta Mesa's February 25, 2019

disclosures, Alta Mesa stock continued to fall from a closing price on February 26, 2019 of 24 cents per share to a closing price of 23 cents per share on February 27, 2019. This decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements. In total, Alta Mesa's stock price declined by about 75% from its closing price on February 25, 2019 through its closing price on February 27, 2018.

391. On May 17, 2019, Alta Mesa disclosed that the SEC was investigating the Company's material weakness in internal controls over financial reporting and the previously disclosed $3.1 billion write-down. The Company also disclosed that it was unable to estimate a date by which it would file its 2018 Form 10-K or its first quarter 2019 SEC disclosures.

392. In addition, Alta Mesa revised downward its previously disclosed reserve estimates by nearly 60%.

393. Finally, the Company told investors that it had retained advisors to explore a potential bankruptcy filing.

394. Following these disclosures, Alta Mesa's stock declined in value by more than 25% from a closing price on May 17, 2019 of 17.6 cents per share to a closing price on May 20, 2019 of 13.1 cents per share. This decrease was a result of a partial but inadequate correction of Defendants' prior materially false and misleading statements about (a) AMH/Alta Mesa oil production and drilling methods; (b) Kingfisher's prospects and expected revenue, and (c) Alta Mesa's internal controls and/or a partial materialization of foreseeable risks concealed by Defendants' prior materially false and misleading statements.

395. With respect to foregoing disclosures alleged herein, the declines in Alta Mesa's stock price were a direct and proximate result of Defendants' scheme being revealed to investors and to the market and/or the materialization of risks that Defendants had concealed from the market. The timing and magnitude of Alta Mesa's stock price declines negate any inference that the economic losses and damages suffered by Plaintiff was caused by changed market conditions, macroeconomic factors, or even Alta Mesa-specific facts unrelated to Defendants' fraudulent conduct.

## X. NO SAFE HARBOR

396. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Alta Mesa who knew that those statements were false when made.

* * *

397. Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaint against Defendants in the Class Action, Plaintiffs' claims are timely. In

particular, Plaintiffs have brought their Exchange Act claims within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, Plaintiffs' Exchange Act claims are timely.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Alta Mesa, the Management Defendants, and the Board Defendants

398. Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

399. During the relevant period, Alta Mesa, the Management Defendants, and the Board Defendants carried out a plan, scheme, and course of conduct that was intended to, and did, (i) deceive the investing public, including Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase Alta Mesa common stock at artificially inflated prices.

400. Alta Mesa, the Management Defendants, and the Board Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Alta Mesa common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

401. Alta Mesa, the Management Defendants, and the Board Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

402. During the relevant period, Alta Mesa, the Management Defendants, and the Board Defendants made the false statements specified above, which they knew or recklessly disregarded

to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

403. Alta Mesa, the Management Defendants, and the Board Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal Alta Mesa's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

404. The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Alta Mesa's common stock. In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Alta Mesa, the Management Defendants, and the Board Defendants, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Alta Mesa, the Management Defendants, and the Board Defendants, but not disclosed in public statements by Alta Mesa, the Management Defendants, and the Board Defendants, Plaintiffs purchased Alta Mesa common stock at artificially inflated prices and thus suffered damages. Plaintiffs would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Alta Mesa's common stock had been artificially inflated by the fraudulent course of conduct of Alta Mesa, the Management Defendants, and the Board Defendants.

405. As a direct and proximate result of the wrongful conduct of Alta Mesa, the Management Defendants, and the Board Defendants, Plaintiffs suffered damages in connection

with their purchases of the Company's common stock during the relevant period.

406. By virtue of the foregoing, Alta Mesa, the Management Defendants, and the Board Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**

**Against All Defendants**

407. Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

408. As alleged above, Alta Mesa, the Management Defendants, and the Board Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this complaint.

409. Each Defendant acted as a controlling person of Alta Mesa within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Alta Mesa, Defendants had the power and ability to control the actions of Alta Mesa and its employees, as well as the Management Defendants and the Board Defendants. By reason of this conduct, Defendants are liable under Section 20(a) of the Exchange Act.

**COUNT III**

**Violations of Section 18 of the Exchange Act Against Alta Mesa, the Management Defendants, and the Board Defendants**

410. Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

411. As alleged herein, the Defendants caused statements to be made in Alta Mesa's

2017 Form 10-K that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

412. An investment analyst working on behalf of Plaintiffs read and actually relied upon information contained in Alta Mesa's 2017 Form 10-K (to the extent that Form 10-K was on file with the SEC at the time) in making each purchase of Alta Mesa common stock.

413. In ignorance of the falsity of Defendants' statements, or of the true facts, Plaintiffs purchased Alta Mesa common stock in actual, justifiable, eyeball reliance upon the representations made by Alta Mesa, the Management Defendants, and the Board Defendants.

414. Defendants' materially false and misleading statements and omissions of material fact artificially inflated the price of Alta Mesa common stock.

415. Had they known the true facts, Plaintiffs would not have purchased Alta Mesa common stock and/or would not have purchased the shares at the inflated prices they paid.

416. Upon disclosure of the true facts, the price of Alta Mesa common stock dropped, and Plaintiffs have suffered damages in an amount to be proven at trial.

417. By reason of the foregoing, Defendants Alta Mesa, the Management Defendants, and the Board Defendants are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r.

## COUNT IV

### Violations of Section 14(a) of the Exchange Act Against Alta Mesa, the Proxy Defendants (Except for Walker and Coates) and Riverstone

418. Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

419. As alleged above, the Proxy provided to Silver Run shareholders, including Plaintiffs contained numerous materially false and misleading statements.

420. As a direct result of these materially false and misleading statements, Plaintiffs were precluded from exercising their right to seek redemption of their Silver Run II shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger. The materially false and misleading Proxy used to obtain shareholder approval of the Merger deprived Plaintiffs of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Silver Run II shares.

421. The false and misleading statements in the Proxy were material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to shareholders.

422. The Proxy Defendants (except Walker and Coates) and Riverstone, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy. Alta Mesa was the issuer of the Proxy and permitted the use of its name in the Proxy by allowing the Proxy to represent, among other things, that the Merger was expected to generate positive returns and was in the best interests of shareholders.

423. Defendant Hackett signed the cover letters for the Proxy, and otherwise permitted the use of his name in the Proxy.

424. The Proxy was issued "By Order of the Board of Directors" and "as part of the solicitation of proxies by [Silver Run's] board of directors." Moreover, the Proxy Defendants (except Walker and Coates) permitted the use of their names by, among other things, allowing the Proxy to represent that they recommended the Merger.

425. Riverstone was Silver Run's sponsor. At the time the Proxy was issued, Silver

Run's management team was employed by Riverstone and the Board was closely affiliated with and controlled by Riverstone.

426. By means of the Proxy and the documents attached thereto or incorporated by reference therein, the Alta Mesa, the Proxy Defendants, and Riverstone sought to secure the approval of Plaintiffs for the Merger, and solicited proxies from Plaintiffs.

427. Each Defendant named in this Count acted intentionally and with scienter in making the false and misleading statements of material facts, and failing to update their statements, which were false at the time they were issued, and were also rendered further false and misleading by additional material information which arose after the dissemination of these statements and before the vote on the Merger. Each Defendant named in this Count acted fraudulently, and not negligently, with respect to the proxy.

428. The solicitations described herein were essential links in the accomplishment of the Merger. As a result of these solicitations, Silver Run shareholders approved the Merger.

429. Plaintiffs were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct and proximate result of the untrue statements of material facts set forth herein.

430. By reason of the foregoing, Alta Mesa, the Proxy Defendants (except Walker and Coates) and Riverstone violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, and did so fraudulently, not negligently.

## COUNT V

### Violations of Section 20(a) of the Exchange Act Against the Proxy Defendants and the Control Entity Defendants

431. Plaintiffs repeat and reallege each and every paragraph contained above as if set

forth herein.

432. As alleged above, Alta Mesa, the Proxy Defendants (except Walker and Coates) and Riverstone violated Section 14(a) of the Exchange Act by their acts and omissions alleged herein.

433. Each of the Proxy Defendants and Control Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their ownership interest, high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, control over material operational data and/or intimate knowledge of the Company's actual performance, and their power to control the Proxy, the Proxy Defendants and Control Entity Defendants had the power and ability to control the information contained in the Proxy. Indeed, Defendants Bayou City, HPS and ARM Energy provided the operational information contained in the Proxy and were unjustly enriched when they received over $1.3 billion from the Merger. By reason of such conduct, the Proxy Defendants and Control Entity Defendants are liable pursuant to Section 20(a) of the Exchange Act.

434. Plaintiffs were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct and proximate result of the materially untrue statements in the Proxy and other solicitations described herein.

435. By reason of the foregoing, the Proxy Defendants and the Control Entity Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## COUNT VI
## Common Law Fraud Against Alta Mesa, the Management Defendants, and the Board Defendants for Statements Prior to the Merger

436. Plaintiffs repeat and reallege each and every paragraph contained above as if set

forth herein.

437. As alleged above, Alta Mesa, the Management Defendants, and the Board Defendants made material misrepresentations of material fact prior to the Merger as set forth above.

438. These misrepresentations were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions to (i) invest in Silver Run common stock; (ii) hold Silver Run common stock and to refrain from selling that stock; and (iii) hold Silver Run common stock through the Merger and not to redeem that stock.

439. These misrepresentations, including misrepresentations made directly by certain Defendants to Orbis Investments during the August 3, 2017 Conference Call, the October 24, 2017 Meeting, and the November 14, 2017 Meeting between certain Defendants and Orbis Investments, were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions (i) invest in Silver Run common stock; (ii) hold Silver Run common stock and to refrain from selling that stock; and (iii) hold Silver Run common stock through the Merger and not to redeem that stock.

440. These misrepresentations constitute fraud and deceit under the common law.

441. Plaintiffs (through Orbis Investments) actually, reasonably and justifiably relied upon the representations when making decisions to purchase Silver Run's common stock and did not know of any of the misrepresentations or omissions.

442. In addition, Plaintiffs (through Orbis Investments) actually, reasonably and justifiably relied upon the representations—including representations made by certain Defendants during the March 20, 2017 Conference Call, the August 3, 2017 Conference Call, the October 24, 2017 Meeting, and the November 14, 2017 Meeting meetings between Orbis Investments and

Silver Run/Alta Mesa personnel—when making decisions to hold and refrain from selling Silver Run's common stock and did not know of any of the misrepresentations or omissions.

443. Likewise, Plaintiffs (through Orbis Investments) actually, reasonably and justifiably relied upon the representations—including representations made by certain Defendants during the March 20, 2017 Conference Call, August 3, 2017 Conference Call, the October 24, 2017 Meeting, and the November 14, 2017 Meeting meetings between Orbis Investments and Silver Run/Alta Mesa personnel—when making the decision to not sell on the market or redeem their Silver Run stock and to hold that stock through the Merger and did not know of any of the misrepresentations or omissions.

444. Plaintiffs would not have purchased Silver Run common stock at the prices it paid, or at all, had they known the truth. In addition, Plaintiffs would not have continued to hold Silver Run common stock had they known the truth. Plaintiffs also would have sold on the market or redeemed their Silver Run common stock and not held that stock through the Merger had they known the truth.

445. As a direct and proximate result of the fraud and deceit by Alta Mesa, the Management Defendants, and the Board Defendants, Plaintiffs suffered damages in connection with their investment in Silver Run common stock.

446. Defendants' wrongful conduct, as described above, was malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

**COUNT VII**
**Common Law Fraud Against**
**Alta Mesa, the Management Defendants, and the Board Defendants for Statements After the Merger**

447. Plaintiffs repeat and reallege each and every paragraph contained above as if set

forth herein.

448. As alleged above, Alta Mesa, the Management Defendants, and the Board Defendants made material misrepresentations of material fact after the Merger as set forth above.

449. These misrepresentations were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions to (i) invest in Alta Mesa common stock; and (ii) hold Alta Mesa common stock and to refrain from selling that stock.

450. These misrepresentations, including misrepresentations made directly by certain Defendants to Orbis Investments during the April 3, 2018 Conference Call, the May 16, 2018 Conference Call, the August 14, 2018 Conference Call, the August 29, 2018 Meeting, the August 30, 2018 Conference Call, the November 13, 2018 Conference Call, and the December 20, 2018 Meeting between certain Defendants and Orbis Investments, were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions (i) invest in Alta Mesa common stock; and (ii) hold Alta Mesa common stock and to refrain from selling that stock.

451. These misrepresentations constitute fraud and deceit under the common law.

452. Plaintiffs (through Orbis Investments) actually, reasonably and justifiably relied upon the representations when making decisions to purchase Alta Mesa's common stock and did not know of any of the misrepresentations or omissions.

453. In addition, Plaintiffs (through Orbis Investments) actually, reasonably and justifiably relied upon the representations—including representations made by certain Defendants during the April 3, 2018 Conference Call, the May 16, 2018 Conference Call, the August 14, 2018 Conference Call, the August 29, 2018 Meeting, the August 30, 2018 Conference Call, the November 13, 2018 Conference Call, and the December 20, 2018 Meeting between Orbis

Investments and Alta Mesa personnel—when making decisions to hold and refrain from selling Alta Mesa's common stock and did not know of any of the misrepresentations or omissions.

454. Plaintiffs would not have purchased Alta Mesa common stock at the prices it paid, or at all, had they known the truth. In addition, Plaintiffs would not have continued to hold Alta Mesa common stock had they known the truth.

455. As a direct and proximate result of the fraud and deceit by Alta Mesa, the Management Defendants, and the Board Defendants, Plaintiffs suffered damages in connection with their investment in Alta Mesa common stock.

456. Defendants' wrongful conduct, as described above, was malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## COUNT VIII

### Violation of Texas Business and Commerce Code § 27.01 Against Alta Mesa, the Management Defendants, and the Board Defendants

457. Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

458. As alleged above, Defendants Alta Mesa, the Management Defendants, and the Board Defendants made false representations of past or existing material facts.

459. These misrepresentations were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiffs when making decisions to invest in Alta Mesa's common stock. Alta Mesa was a corporation at the time of these misrepresentations.

460. These misrepresentations constitute fraud under Section 27.01(a) of the Texas Business and Commerce Code.

461. Plaintiffs (through Orbis Investments) actually, reasonably, and justifiably relied

upon the representations when making decisions to purchase Alta Mesa's common stock and did not know of any of the misrepresentations or omissions.

462. Plaintiffs would not have purchased Alta Mesa's common stock at the prices it paid, or at all, had they known the truth.

463. As a direct and proximate result of the fraud and deceit by Alta Mesa, the Management Defendants, and the Board Defendants, Plaintiffs suffered damages in connection with their investment in Alta Mesa's common stock.

464. Defendants' wrongful conduct, as described above, was undertaken with actual awareness of the falsity of their statements. Accordingly, exemplary damages, in addition to compensatory damages, are appropriate under Section 27.01(c) of the Texas Business and Commerce Code

465. By virtue of their violation of Section 27.01 of the Texas Business and Commerce Code, Defendants are also liable to Plaintiffs for reasonable and necessary attorneys' fees, expert witness fees, costs for copies of depositions, and costs of court pursuant to Section 27.01(e).

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief and judgment, as follows:

(a) Awarding compensatory or rescissory damages against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b) Awarding punitive damages against Defendants;

(c) Awarding Plaintiff its reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, costs for copies of depositions, and costs of court; and

(d) Such equitable, injunctive, or other and further relief as the Court may deem just and proper.

## XII. JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: August 3, 2022

By: */s/ Jules P. Slim*


Jules P. Slim
State Bar No. 00793026
Attorney and Counselor
PO Box 140307
Irving, TX 75014-0307
Tel.: (214) 350-5183
Fax: (214) 350-5184
jslim@slimlawfirm.com

*Attorney-in-Charge for Plaintiffs*

Of Counsel:

ROLNICK KRAMER SADIGHI LLP

Lawrence M. Rolnick (*pro hac vice forthcoming*)
Marc B. Kramer (*pro hac vice forthcoming*)
Steven M. Hecht (*pro hac vice forthcoming*)
Matthew A. Peller (*pro hac vice forthcoming*)
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 597-2800

lrolnick@rksllp.com
mkramer@rksllp.com
shecht@rksllp.com
mpeller@rksllp.com